**UNITED STATES of America**

**v.**

**Thomas BRUDER, Charles Schwarz, and Thomas Wiese, Defendants.**

**No. 98 CR 196.**

United States District Court, E.D. New York.

June 27, 2000.

---

Loretta E. Lynch, United States Attorney, Eastern District of New York (Alan Vinegrad and Lauren Resnick, of counsel), Brooklyn.

Stuart London, Worth, Longworth, Bamundo, & London, LLP, New York City, for defendant Thomas Bruder.

Ronald P. Fischetti, New York City, for defendant Charles Schwarz.

Joseph Tacopina, New York City, for defendant Thomas Wiese.

## SENTENCING OPINION AND ORDER

NICKERSON, District Judge.

On June 8, 1999, defendant Charles Schwarz was found guilty on Counts One and Four of a twelve-count superceding indictment. Count One charged Schwarz with conspiracy to deprive Abner Louima of his civil rights in violation of 18 U.S.C. § 241, and Count Four charged him with violating Louima's civil rights under color of law by striking and sexually assaulting him in violation of 18 U.S.C. §§ 242 and 2.

After the verdict, Schwarz moved for a new trial. The Court denied the motion on July 28, 1999. *See United States v. Volpe*, 62 F.Supp.2d 887 (E.D.N.Y.1999) ("*Volpe I*").

Justin Volpe was also named as a defendant in Counts One and Four. Volpe pleaded guilty to these and other counts on May 25, 1999, and was sentenced by this Court on December 13, 1999. *See United States v. Volpe*, 78 F.Supp.2d 76 (E.D.N.Y.1999) ("*Volpe II*").

Count Twelve of the superceding indictment charged Schwarz and defendants Thomas Bruder and Thomas Wiese with conspiracy to obstruct justice in violation of 18 U.S.C. § 371. That count was severed and tried separately. On March 6,

2000, a second jury found Schwarz, Bruder and Wiese guilty of Count Twelve.

The Court must sentence these defendants under the United States Sentencing Guidelines ("the Guidelines"), unless the statute of conviction imposes mandatory sentence restrictions. *See* 18 U.S.C. § 3553; U.S.S.G. § 5G1.1 (1998).

In separate Presentence Investigative Reports, all dated May 8, 2000 (the "Presentence Reports"), the United States Probation Department calculated each defendant's offense level under the Guidelines. Defendants object to various portions of those reports and seek several downward departures.

This opinion and order sets forth the Court's findings and conclusions as to the sentences the Court imposes on Bruder, Schwarz and Wiese. The details of the sentences appear in Appendix I to this opinion.

## I. Factual Background

The exhibits and testimony in the record show the following.

### A. The Assault

*At Club Rendez–Vous*

At approximately 4:00 a.m. on August 9, 1997, New York City Police officers from the 70th Precinct were summoned to Club Rendez–Vous, a nightclub located on Flatbush Avenue in Brooklyn, New York. Among them were Officers Justin Volpe, Thomas Bruder, Charles Schwarz, Thomas Wiese, Eric Turetzky and Mark Schofield. Volpe and Bruder were partners that night, although they did not typically work together. Schwarz and Wiese, regular partners, responded to the scene together.

The officers attempted to disperse a large crowd that had gathered outside the club to watch a fight between two patrons. As the officers tried to push and urge the crowd away from the club, several of those gathered on the street became unruly, yelling and throwing bottles at the officers.

During the incident, Volpe struggled with a Haitian patron named John Rejouis

and eventually pushed Rejouis to the ground. Rejouis attempted to show Volpe his New York City Corrections Officer's badge. Volpe slapped Rejouis's hand and knocked the badge to the ground.

Louima testified that he approached the crowd and heard Rejouis complaining that he had been hit by a police officer. Louima began yelling angrily at the officers near Rejouis, including Volpe.

Volpe attempted to push Louima away from the club, but Louima refused to move. As the confrontation escalated, Volpe was struck on the side of his head and knocked to the ground. Volpe thought Louima had hit him. In fact, Yves "Jay" Nicholas, Louima's cousin, struck Volpe and then fled.

Volpe and several other officers chased Nicholas up Flatbush Avenue. During the chase, Volpe encountered, assaulted, and arrested Patrick Antoine, an individual who had not been at the club and was simply on his way home. Volpe subsequently swore out a false complaint against Antoine.

Meanwhile, Schwarz, Wiese and other officers were placing Louima in custody. Louima testified that, after yelling at the police regarding Volpe's treatment of Rejouis, he heard a male voice behind him say "shut up" and was hit in the back of the head and knocked to the ground. He said he was then lifted up and knocked to the ground again. Louima also testified that several officers began "punching [and] kicking me all over my body." Other witnesses denied that Louima was beaten. Louima said one officer put a knee on his back and wrested his arms from underneath him in order to place him in handcuffs.

Other witnesses gave somewhat different accounts of this sequence. Jay Nicholas testified that he saw Volpe push Louima from the front, turn him around, and push him from the back. Louima fell on his face, Nicholas said. Volpe and several

other officers tried to place handcuffs on Louima, who was "tossing and turning in order for the police not to put handcuffs on him," according to Nicholas. It was at that point that Nicholas "punched the police in his ear," he said.

Turetzky testified that he saw Schwarz and Wiese attempting to place Louima in handcuffs. Turetzky and another officer joined them, and together the officers brought Louima to the ground, his face hitting the asphalt. Turetzky said Louima struggled to avoid being handcuffed, and the officers used some force to pull Louima's right hand from underneath him and place it in handcuffs. Turetzky said he put his knee on the back of Louima's leg, and another officer had a foot or knee on Louima's neck.

Schwarz testified that after he saw Volpe "go down," he grabbed Louima by the arm and attempted to arrest him. Louima then pulled away and "started flailing his arms, and he struck me on the side of my head with his fist." Wiese then came to Schwarz's aid, and the officers "took Louima to the ground." Schwarz also said that he injured his left hand during the fall.

Turetzky was asked whether he saw Louima "hitting any of the officers who were attempting to arrest him." Turetzky said, "No, I did not."

*To the 70th Precinct*

Once Louima was handcuffed, Schwarz and Wiese placed him in their patrol car to take him to the 70th Precinct. Schwarz was the driver of the patrol car, and Wiese was the passenger.

At the first trial, Louima testified that both officers spoke to him during the drive, one of them telling him he should "go back to [his] country."

While Schwarz was driving Louima to the 70th Precinct, Sergeant Bellomo broadcast a description of the man who had assaulted Volpe. Although he was not the assailant, Louima matched the description.

Louima testified that the patrol car made three stops en route to the stationhouse. The first was in the vicinity of Glenwood Road and Nostrand Avenue.

The second stop was at Glenwood Road and Bedford Avenue, where Schwarz and Wiese radioed Bellomo that they had in custody a suspect in the assault on Volpe. Volpe and Bruder then drove to Glenwood and Bedford to identify Louima. Upon arrival, Volpe got out of his car and approached Louima, who was still in handcuffs in the back of the patrol car driven by Schwarz. Volpe taunted Louima and beat him on his head and face with a closed fist and a radio. Louima sustained lacerations and abrasions on his face and swelling in his mouth and around his eye.

Schwarz and Wiese were charged with assaulting Louima at Glenwood and Nostrand and at Glenwood and Bedford, and Bruder was charged with assaulting Louima at Glenwood and Bedford. The jury in the first trial found the officers not guilty of these assaults.

The third stop occurred as Schwarz and Wiese continued driving Louima to the 70th Precinct after the stop at Glenwood and Bedford. Louima testified that the passenger turned to look at him and told the driver that Louima was bleeding, and that the driver stopped the car briefly, looked back at Louima, and then continued driving.

*At the Front Desk*

Louima testified that, when they arrived at the stationhouse, the driver took him out of the car and led him to the front desk. Other witnesses testified that Schwarz and Wiese led Louima into the stationhouse together.

A diagram of the ground floor of the 70th Precinct appears in Appendix II to this opinion and order.

Records showed that Louima arrived at the front desk at 4:35 a.m. Schwarz searched Louima, removing his wallet and cash from his pockets. Schwarz and Ser-

geant Jeffrey Fallon, the desk officer then on duty, counted Louima's money, and Schwarz filled out a "pedigree card" containing basic information on Louima.

Following standard procedures, Schwarz removed Louima's belt during the search. Turetzky testified that Louima's pants fell down, and that Schwarz "left the pants down by Mr. Louima's knees." Louima testified that the driver pulled his pants and underwear down to his knees.

Meanwhile, Volpe had arrived at the precinct. He saw Louima at the front desk and then walked to the Juvenile Questioning Room, where he grabbed a wooden broom stick and broke it over his knee. He placed the bottom of the stick behind a locker, then took the upper section to the bathroom and put it behind a garbage can.

Volpe then left the bathroom and walked to the front desk, where Schwarz and Fallon were still processing Louima's arrest. Volpe borrowed a pair of leather gloves from Officer Mark Schofield, who was standing near the front desk.

Before Louima was led toward the back of the precinct, Wiese and Volpe argued over who would get credit for arresting Louima. It was decided that Volpe and Bruder would take the arrest, and that Bruder would complete the arrest paperwork while Volpe went to the hospital. Bruder then went to the Juvenile Processing Room to fill out the paperwork.

*To the Bathroom*

Schwarz testified at trial that he remained at the front desk area filling out the pedigree card and counting Louima's money until after Louima was led away from the desk.

Sergeant Fallon testified that Louima was not led away from the front desk until after the pedigree card was filled in and the cash was counted and returned to Louima. Fallon recorded the arrest in a "command log" at 4:50 a.m. He testified that he made that entry after the arrest paperwork was complete. The command

log shows that Louima's cash was "counted and returned pending vouchering" at that time.

Turetzky told state investigators that he saw Schwarz "put the [pedigree] card on the top of the [front] desk" before Louima was lead away.

Fallon recalled that, after receiving the completed pedigree card, he ordered that Louima be taken to a cell in the back of the stationhouse. Fallon testified that when he gave that order, Schwarz was "right up next to [Louima]" and "just pretty much [had] control of [him]."

Schofield testified that at this time he was standing near the front desk area with a view down the hallway leading to the back of the stationhouse. He said he saw Schwarz leading Louima "from in front of the front desk, around [the front end of] the 124 Room, [and] toward the back area." The two passed "two to three feet" in front of Schofield. He said Louima's pants were down, but he did not see Louima's bare buttocks. Schofield also said that Louima "was rear handcuffed, and he was shuffling with his feet like his pants were restricting his movement."

Schofield said his last view of Louima and Schwarz was near the end of the hallway leading to the back of the stationhouse, "towards that top table corner of the 124 Room, out by the Juvenile Room."

Schofield did not tell investigators that he had seen Schwarz leading Louima toward the back until after he had been interviewed several times. He did reveal it to the federal grand jury in November, 1997.

Turetzky said he saw Schwarz "escort Mr. Louima from the main desk area, around the 124 Room, toward ... the Arrest Room." He also said Louima's pants and underwear were around his ankles. Turetzky said:

> Officer Schwarz was holding Mr. Louima's arm, which was behind Mr. Louima's back, and because Schwarz was

apparently much taller than Louima, Louima was raised off the ground and was shuffling along.

Turetzky said he did not see Volpe in the area at this time.

Turetzky also saw Schwarz take Louima to the end of the hallway near the door of the Arrest Processing Room, which contains the holding cells. "Instead of going into the Arrest Room, I observed them make a right and go around the 124 Room," he said.

He then saw Schwarz and Louima walking down a corridor that leads to the public bathroom and to two other rooms that are locked and inaccessible to patrolmen. Asked whether he saw Schwarz and Louima "walk past the entranceway to the cell area," Turetzky said "yes." Turetzky lost sight of Schwarz and Louima approximately six feet from the door to the bathroom, and did not see them go inside the bathroom.

In his first interview with Internal Affairs on August 10, 1997, the day after the assault and the same day that he had received surgery for his wounds, Louima said that two officers took him directly from the front desk to a holding cell, where he remained for about ten minutes before being taken to the bathroom. He also said that it was inside the bathroom that his pants were first pulled down.

But on August 11, 1997, and in several grand jury appearances and at both trials, Louima said substantially the following. After being at the front desk, "the driver took me to the bathroom." Louima's pants and underwear were still around his knees, and the driver held him "with the chain of the handcuffs and push[ed] me." Before entering the bathroom, Louima "heard somebody coming behind ... [a]nd I turned my head and there was ... Officer Volpe."

*Inside the Bathroom*

Louima, Wiese and Volpe each gave a different account of what happened inside the bathroom. Schwarz and Bruder also testified as to the whereabouts of Schwarz and Wiese during the bathroom assault.

The stories of Schwarz, Wiese, Bruder and Volpe are discussed elsewhere in this memorandum and order. Each of these stories conflicts with Louima's testimony and pretrial statements. They also conflict to varying degrees with one another, with the medical evidence, and with the testimony of witnesses who saw Schwarz leading Louima toward the bathroom.

Louima never definitively identified the driver as Charles Schwarz, either from photo arrays or in court. He testified at both trials that the "face ... and hair style" of the driver and passenger were similar, but that "the driver was bigger than the passenger." When asked at the first trial by Schwarz's counsel whether he could identify Schwarz in the courtroom as the driver, Louima said, "It looks like the driver but I'm not sure because the ... the driver and the passenger, they look alike."

Several aspects of Louima's identification of "the driver" are corroborated by other evidence. For instance, he testified that the driver put handcuffs on him outside the nightclub, testimony corroborated by Schwarz. He also consistently stated that it was the driver who searched him at the front desk, and that the driver was "very close" to him during the search. Fallon, Turetzky, and Schwarz all testified that it was Schwarz who searched Louima. Louima's description of the driver as "bigger" than the passenger was corroborated by photographs in evidence. And Louima's testimony that the driver led him from the front desk in the direction of the bathroom was also corroborated by Turetzky and Schofield.

Beginning with his first interview with state investigators, which took place on August 10 while he was still in the hospital recovering from surgery, Louima consistently stated that there were two officers in the bathroom; that both took part in

the assault; and that one of them was "the driver."

Louima's testimony regarding what happened inside the bathroom is substantially as follows.

Upon entering the bathroom, Volpe "pick[ed] something by the garbage can" and told Louima, "I'm going to do something to you. If you yell or make any noise, I'll kill you."

Louima testified at trial that Volpe then pushed him to the floor, with his head near one of the toilets. On August 12, 1997, while still in the hospital, Louima told Lieutenant Reinaldo Daniels of Internal Affairs that "the driver pushed me to the ground."

Louima said that Volpe then kicked Louima in the groin. Volpe denied doing so, but medical evidence showed that Louima's penis was significantly swollen when he arrived at the hospital.

Louima testified at the second trial that when he cried out in pain, "the driver put his foot on my mouth [and said] 'Shut up.'" At the first trial, Louima stated that after Volpe kicked him, "I yell [and] *he* put his foot in my mouth" (emphasis added). On cross-examination at both trials, Louima reiterated that it was "the driver" who put his foot on Louima's mouth.

Louima testified at the second trial that Volpe then "punch[ed] me, very angry, kick[ed] me all over my body." At the first trial, he testified that, after he was kicked in the groin, "*both* [officers] started hitting me, punching me" (emphasis added). In testimony before the state grand jury, which was videotaped on August 15, 1997, the following exchange took place:

Question: The other guy also struck you while you were inside the bathroom?

Answer: Yes, yes.

Question: So they were both working together to hurt you, do you know?

Answer: Yes, both of them.

Louima testified at the second trial that, while he was lying on the floor, the door to the bathroom opened and closed, but that he did not see who had opened it. He did not say this to state investigators, to the state or federal grand juries, or in testimony at the first trial.

The driver then lifted Louima partially off the floor by the handcuffs, according to Louima. At the first trial he said that "the driver pull me off by the handcuff," and at the second trial he said that the driver "pull[ed] me up, holding the chain of the handcuffs."

With the driver holding Louima in this position, "Officer Volpe put an object in my rectum." The medical evidence showed that Volpe forced the broken broomstick approximately six inches inside Louima, puncturing his rectum and bladder. Volpe removed the stick, which was covered with Louima's feces, and held it in front of Louima's mouth and taunted him. Volpe then slammed the stick against the wall, leaving traces of feces.

In an interview on August 11, 1997, the following exchange took place between Louima and Lieutenant Daniels:

Question: So the same cop that put the handcuffs on you in the street is the same cop that put the stick in your rectum?

Answer: Yes.

Later in that interview, Louima answered "yes" when asked whether it was the driver who placed him in handcuffs and wielded the stick inside the bathroom. But he also identified Volpe from photographs as the one who had sodomized him.

Louima testified that he had no recollection of that interview, which took place in the hospital two days after the assault, and was unaware that it had taken place until he later heard a tape recording.

In videotaped testimony to the state grand jury that Louima delivered from his hospital bed on August 15, 1997, he was asked the following questions and gave the following answers:

Question: [W]hile this object was being pushed into your body, what was the other guy doing?

Answer: I don't know.

Question: Was anybody holding you?

Answer: No.

Louima explained that he made these statements were made while he was medicated and "in constant pain and I was very, very afraid that I was going to die. I have tubes all over my body." The statements are also contradicted by his testimony in both trials and before the federal grand jury in February of 1998.

At the first trial, Louima said that the driver was "holding me on the chain of that handcuff and my head was facing down." Louima said he was "on my feet, but my face [was] down, like bent over." The driver was "facing me, but holding me with the handcuff." The jury in that trial found Schwarz guilty of participating in the bathroom assault.

At the second trial, Louima stated that "I was on my feet, but the way he was holding me is like my head was under his arm, and he was holding the handcuffs."

Before the federal grand jury, Louima testified as follows:

Question: If Officer Volpe put the stick into your rectum, was anyone holding you?

Answer: Yes.

Question: Who was holding you?

Answer: The driver.

Both Turetzky and Schofield gave testimony regarding the location of Wiese during this period. Turetzky testified that, as he saw Schwarz escorting Louima away from the front desk and toward the back, Wiese was "at the main desk area with the second prisoner, Mr. Antoine." Turetzky told Internal Affairs that Wiese was in a position to see Schwarz and Louima leaving the desk.

Schofield said that, after he saw Schwarz leading Louima toward the back of the precinct, he briefly went into the 124 Room, then returned to the front desk area. "A few minutes" later, he saw Wiese talking to Fallon at the front desk. Schofield and several other officers, including Wiese, stayed in that general area for approximately "ten minutes," at which point Volpe "walked out from the back area" and "gave back the gloves that he borrowed."

Schofield was also asked whether he saw Schwarz near the front desk after seeing Schwarz take Louima toward the back, and before Volpe returned Schofield's gloves. Schofield said "no."

*After the Assault*

With Louima crying and in severe pain, the driver began to lead him out of the bathroom. Before they left the bathroom, Volpe told Louima, "If you tell anybody about this, I'll find you and kill you and your whole family."

Louima testified that just outside the bathroom door, "[Volpe] said he 'got me,'" and then took Louima from the driver and led him to a holding cell, with Louima's pants and underwear around his ankles. Volpe put Louima in a cell and told Louima to get onto his knees. Volpe then left the cell area, placed the stick in an unknown location, and returned the leather gloves, now covered with Louima's blood, to Schofield.

After being placed in the holding cell, Louima asked a police officer to call an ambulance. The same officer later came into Louima's cell, took off his handcuffs, told him to pull his pants up, and retrieved a shoe that had fallen off of Louima's foot. The officer later brought Louima a chair to sit on while he was treated by paramedics. Louima told F.B.I. agents that this officer "saved my life." Louima could not identify the officer, but the evidence indicates that it was Bruder.

Several of the officers involved in the events outside the nightclub, including Volpe, Schwarz, Wiese and Schofield, went to the New York Community Hospital on

the morning of August 9, 1999, to be treated for minor injuries. Sergeant Fallon's log shows the officers leaving for the hospital at 5:05 a.m.

Volpe rode to the hospital in a patrol car with Schofield and Barr; Wiese and Schwarz rode together. Schofield testified that he, Barr and Volpe arrived at the hospital first, and that Volpe waited outside for a few moments, then came in with Wiese and Schwarz.

In the waiting area of the hospital, Schofield overheard Volpe say "I broke a man down." Schofield said that Volpe was sitting next to Wiese when he made this statement, and Schwarz was about six feet away.

After returning to the 70th Precinct, Volpe encountered Louima sitting outside his cell on the chair provided by Bruder. Volpe cursed at Louima, pulled the chair away from him, and told him to return to the cell and get down on his knees.

Louima testified that Volpe later came to Louima's cell once more and "put his hand under my chin and tell me [to] look him in the eyes, and he tell me if I ever talk to anyone about what happened to me he'll kill me and everybody in my family."

Later that morning, Volpe told Sergeant Kenneth Wernick what he had done to Louima, saying "I took a man down tonight." Volpe also showed the stick used in the sexual assault to Wernick and Officer Michael Schoer, and later threw the broom handle into a trash bin outside the precinct.

Approximately four hours after the bathroom assault, Louima and Antoine were taken to Coney Island Hospital in Brooklyn. Antoine received stitches and was discharged later that day.

Louima was treated for internal injuries to his bladder and rectum, as well as head injuries and a laceration over his eye. On the evening of August 9, 1997, doctors surgically repaired a two-centimeter perforation to Louima's rectum and a three-centimeter perforation to his bladder. Doctors also performed colostomy and cystostomy procedures.

Louima remained hospitalized for two months until October 10, 1997. Among the complications he suffered was an intestinal blockage requiring emergency surgery and the implantation of a colostomy bag. Louima underwent surgery again in February 1998 to remove the colostomy bag. After his release from the hospital, Louima received medical and psychiatric treatment on an outpatient basis and continued to suffer severe headaches, abdominal pain and insomnia.

### B. The Conspiracy

State officials began investigating the assaults of Abner Louima on August 10, 1997, and federal officials opened an investigation on August 13, 1997. Count Twelve of the superceding indictment charged that, beginning in the days immediately following the assault and continuing until December of 1997, Wiese, Bruder, Schwarz and others conspired to obstruct the federal grand jury investigation into the sexual assault of Louima. The indictment alleged that "it was part of the conspiracy that [Bruder and Wiese] would provide false and misleading information to federal and local law enforcement officials in an effort to exculpate [Schwarz] with respect to the sexual assault."

The evidence of conspiracy fell largely into three categories. First, the government introduced evidence, discussed above, regarding the events of August 9, 1997.

Second, the government introduced evidence of a series of statements defendants made to law enforcement officials and others during the state and federal investigations. Through these statements, defendants put forward several different and often conflicting versions of the events of August 9, 1997. Changes in these stories over time corresponded to developments in the investigations, including most prominently the arrest of Schwarz on August 15, 1997.

The indictment charged that two of these statements—one by Wiese to state investigators on August 17, 1997, and one by Bruder to federal investigators on November 8, 1997—constituted overt acts of the conspiracy.

The third category of evidence showed extensive communications between the defendants and others in the weeks and months following the assault on Louima. These communications included more than 250 telephone calls between various of the conspirators between August 9, 1997 and February 5, 1998, many of them at key points during the investigations. The government asserted that the timing of these communications, as well as their substance, where corroborated, indicated that the phone calls constituted overt acts of the conspiracy.

One of the parties to the phone calls was Anthony Abbate, a close friend of Schwarz and a former police officer and Patrolmen's Benevolent Association ("P.B.A.") representative from the 70th Precinct. The government introduced evidence regarding the nature of Schwarz's relationship with Abbate, and Abbate testified at trial.

There was also evidence that defendants and a P.B.A. official met in the basement of the 70th Precinct to discuss their response to Louima's allegations, and that Schwarz and Wiese had several opportunities to speak in person.

### 1. August 10—12

On August 10, 1997, the Internal Affairs Bureau of the New York City Police Department began an investigation into the events at the 70th Precinct. That afternoon, Sergeant William Hargrove of Internal Affairs tried to interview Louima, who was recovering from surgery and unable to speak. Hargrove returned later and succeeded in interviewing Louima, who responded to questions only with difficulty.

After questioning Louima, Hargrove went directly from the hospital to the 70th Precinct, where he and other officers declared the bathroom a crime scene and searched for evidence.

Wiese and Schwarz were on patrol on the morning of August 11, 1997 and came to the stationhouse for a meal break at approximately 4:08 a.m. A rumor had spread inside the precinct that Internal Affairs was investigating a sexual assault in the ground floor bathroom.

Shortly after Schwarz and Wiese went back on patrol, they drove to a public telephone and made three calls using Schwarz's calling card. At 6:12 a.m., a three-minute call was placed to Bruder's home; at 6:16 a.m., a six-minute call was placed to Volpe's home; and at 6:18 a.m., Schwarz placed a thirty-eight minute call to Anthony Abbate.

### Anthony Abbate

To explain Schwarz's relationship with Abbate and his possible intent in calling Abbate at key points during the Louima investigation, the government introduced evidence regarding an earlier incident at the 70th Precinct involving Abbate and Schwarz.

On August 5, 1994, Abbate had an argument with Officer Carmen Martinez (then named Rodriguez) in the basement of the 70th Precinct. Witnesses said that Abbate used profanity toward Martinez many times during their confrontation. Abbate was charged by the Police Department with discourtesy to another officer and with lying under oath by denying that he used profanity toward Martinez.

These charges were the last of many disciplinary actions against Abbate during his twelve years on the police force. He was tried by the department four times, each time on multiple charges; disciplined for dozens of infractions; suspended; placed on disciplinary probation; and placed in a special disciplinary monitoring program.

On October 28 and 29, 1996, the Police Department tried Abbate on the charges stemming from the Martinez incident, and

on discourtesy charges involving a second police officer. Schwarz testified at that trial on Abbate's behalf and corroborated Abbate's version of the confrontation with Martinez. Schwarz said he was "approximately five to ten feet" from the confrontation, and that he "absolutely [did] not" hear Abbate use profanity.

Schwarz repeated this position in testimony at the second trial of this case, stating that "I never heard [Abbate] use the 'F word' during the argument."

Both Martinez and Officer Denise Ortiz, who witnessed the ensuing confrontation, said that Abbate used the word "fuck" in speaking to Martinez approximately "every third word." Ortiz said he used the word a total of approximately thirty times.

Schwarz also denied that he had discussed his testimony with Abbate, or even the fact that he planned to testify, prior to appearing at the departmental trial. Abbate testified before this Court that he and Schwarz had discussed the Rodriguez incident, and that Abbate had called Schwarz to testify on his behalf at the departmental trial.

On December 5, 1996, the administrative judge found Abbate guilty of lying under oath when he denied using profanity toward Martinez, and of discourtesy toward another officer in a second incident. Abbate was dismissed from the police force a few days later.

The Police Department never instituted disciplinary action against Schwarz on the basis of his testimony at the departmental trial.

Schwarz also allegedly attempted to intimidate witnesses who were testifying against Abbate at the departmental trial. Ortiz testified before this Court that, while she was waiting to testify at the departmental trial, Schwarz stared in an intimidating manner at her and other witnesses. Ortiz and Martinez also testified that Schwarz sat inside the courtroom during their testimony and "stared" at them.

Ortiz testified that, a few days after the trial, she and another officer who had testified against Abbate received identical anonymous letters in interoffice envelopes stating in substance that "you're a rat" and "you ought to be ashamed of wearing blue." Schwarz was still assigned to 70th Precinct, but Abbate had been transferred away.

Ortiz said she approached Schwarz and accused him of sending the letter to her and threatened to report it. Schwarz "said nothing" in response, but "just laughed and chuckled at me." Ortiz took the letter to the precinct's executive officer, but the matter was never pursued.

Abbate and Schwarz remained close after Abbate was fired from the police department.

*Telephone Calls—Anthony Abbate*

Telephone records showed only nine calls between Schwarz's home phone and Abbate's home phone in the two months leading up to August 9, 1997. None of these calls were placed before 11:18 a.m.

By comparison, from August 9 to August 17, 1997, eleven calls were placed between phones used by Schwarz and Abbate's home phone. The first of these calls was placed from Schwarz's home phone to Abbate's home phone at 10:32 on the morning of August 9, 1997, shortly after Schwarz arrived home from the shift during which Louima was assaulted. The second was the call from the telephone booth using Schwarz's calling card on the morning of August 11, 1997, shortly after Schwarz and Wiese learned that Internal Affairs was investigating the assault.

Schwarz acknowledged calling Abbate early on the morning of August 11. Schwarz testified that he and Wiese had not discussed up to that point whether anything had happened inside the bathroom. He said he phoned Abbate, whom he called a "good friend" and a "very experienced [P.B.A.] delegate," to discuss his "concerns" about the investigation. Specifically, Schwarz said he was worried

that being placed on modified duty would interfere with family obligations, and that the incident could jeopardize a transfer application he had submitted.

Schwarz said Abbate advised him in that conversation to "seek some type of legal counsel." Schwarz did not retain a lawyer until several days later.

Between August 12 and August 16, 1997, nine more calls were placed between phones used by Schwarz and Abbate's home phone, including two calls from Schwarz while he was in detention following his arrest. Schwarz used telephones in the supervisor's office at Central Booking, rather than the pay phones normally used by detainees.

Abbate and Schwarz both confirmed at trial that they spoke several times during this period and discussed Louima's allegations. Abbate said Schwarz expressed his concern over the allegations, but denied advising Schwarz on how to thwart the investigation.

Schwarz denied talking to Abbate about whether he took part in the bathroom assault. But Abbate testified that Schwarz told him in these conversations that he had brought Louima into the precinct, searched him, led him away from the desk, and "handed [him] over to Justin Volpe." Abbate told the federal grand jury that Schwarz told him that, after handing Louima over to Volpe, Schwarz "was by the desk speaking to the desk sergeant."

The government also introduced evidence of calls between Wiese and Abbate. There were no calls between Abbate's home phone and phones used by Wiese in the two months prior to August 9, 1997. Asked whether it was true that, before the incident on [August] 9 of 1997, [Abbate] had not spoken to [Wiese] on the telephone in years, Abbate said, "that could very be a fact, yes."

Between August 9 and August 17, there were nine calls between Abbate's home phone and phones used by Wiese, and an additional fifteen calls between August 19 and November 14, 1997.

### 2. August 12

On August 12, 1997, Lieutenant Daniels of Internal Affairs interviewed Louima at Coney Island Hospital. Louima was still under arrest, handcuffed to his bed and guarded by a uniformed police officer whom Daniels asked to leave before the interview.

At approximately 8:00 p.m. on August 12, a local television station, New York 1, reported Louima's allegations of sexual assault.

Telephone records showed twenty calls between phones used by Wiese, Schwarz, Bruder and Abbate on August 12 alone, the first of them a thirteen minute call from Wiese's home phone to Schwarz's home phone at 2:10 a.m. Eleven of these calls, and a twelfth just after midnight on August 13, occurred within a few hours after the story broke on New York 1.

### 3. August 13—14

On the morning of August 13, 1997, the New York *Daily News* reported Louima's allegations in a front page story. Also on that morning, Volpe, Bruder, Wiese and Schwarz all reported to police headquarters to be placed on "modified" duty.

Telephone records showed six calls between phones used by Wiese, Bruder, Schwarz and Abbate on the morning of August 13, after the story hit the newspapers and before the defendants reported to police headquarters.

*The Basement Meeting*

Later on August 13, Wiese, Schwarz, Bruder and Volpe met in the basement of the 70th Precinct with Michael Immitt, a patrol officer and a trustee of the Patrolmen's Benevolent Association ("P.B.A.") for the Brooklyn South region, which includes the 70th Precinct. Volpe's brother, Officer Damien Volpe, was also present at the meeting. Damien Volpe worked at the 70th Precinct and was a P.B.A. delegate.

Hugo Ortega, an attorney with the law firm that at the time represented the P.B.A., testified for the defense that he was also present at the basement meeting.

The government argued that the purpose of the meeting was to devise a strategy in response to Louima's allegations, and that the conspirators followed that strategy until it was made untenable by further advances in the investigation.

Immitt testified that Wiese opened the meeting by saying in substance "that there was an incident over the weekend at a bar and they took prisoners in, and I think one of the prisoners was making some kind of an allegation." The rest of the meeting was "mainly Justin Volpe" speaking, saying that "the prisoner" was making some allegation against him but not saying specifically what the allegation was.

Immitt also testified that he told Volpe at that meeting to get an attorney before speaking to Internal Affairs. He also told the rest of the officers "not to discuss [the allegations] with anybody." Immitt told the federal grand jury that he said "sit tight, don't talk about it. Don't talk to anyone unless something official comes down and, if it does, call me, I'll get an attorney down here."

The entire meeting took approximately twenty to thirty minutes, according to Immitt.

Deputy Inspector James Burns of Internal Affairs testified that Wiese said that the meeting consisted of "a discussion of . . . what happened, what the 'suits' thing [the Internal Affairs investigation] was all about." Wiese described Bruder as being "very nervous, concerned."

According to Burns, Wiese said Volpe "pulled him to the side and [said] 'they have nothing, there's no stick.'" Volpe also reportedly told Wiese "that he didn't do anything." According to Wiese, "Volpe tried to make up a story where Abner Louima did this to himself; that all . . . Volpe did was take him to the bathroom. 'I didn't even go in there.'"

Special Agent Richard DeFilippo of the F.B.I. said that Bruder told federal investigators that at the basement meeting, the officers "met with their union representatives and discussed what had occurred." Bruder told investigators that it was at or just before this meeting that he first learned that Louima was alleging he had been sexually assaulted.

DeFelippo testified that Bruder described Volpe as repeatedly saying "'It's all allegations.'" DeFilippo was not sure whether Bruder said Volpe made that statement at or just before the basement meeting.

Schwarz testified that he arrived late at the meeting. He said "the only thing I recall [being said] is [Immitt] saying we were getting legal counsel." Schwarz denied hearing any discussion of the substance of Louima's allegations, or that he asked other officers what happened at the meeting before he arrived.

Immitt told the federal grand jury that in the days after the basement meeting, he attended roll calls for each of the three shifts at the 70th Precinct and told the officers "not to talk about the incident." He said he did so "for the four [officers] involved," in part because he "knew Internal Affairs was around the stationhouse."

On the evening of August 13, Internal Affairs arrested Volpe.

Telephone records show another flurry of phone calls, at least eight in all, between phones used by the defendants and by Abbate in the hours following Volpe's arrest.

Also on August 13, the F.B.I. commenced a federal investigation into the assaults on Louima.

On August 14, 1997, *Newsday* reported that the federal government had begun to investige the assaults on Louima.

There were sixteen calls between phones used by Wiese, Schwarz, Bruder and Abbate on August 14.

All told, there were fifty-seven calls between phones used by the defendants from August 11 to August 14, 1997, and another twelve between Abbate's home phone and phones used by Schwarz and Wiese.

#### 4. August 15

Early on the morning of August 15, 1997, Eric Turetzky spoke to investigators from Internal Affairs and Brooklyn South Investigations, an arm of the Police Department that investigates certain allegations of misconduct. Among other things, Turetzky said he saw Schwarz leading Louima in the direction of the bathroom and Volpe carrying a stick as he led Louima to the holding cell.

Earlier that week, Turetzky had a brief encounter with Damien Volpe outside the stationhouse. As the two passed by each other, Damien Volpe said "stick together [or] . . . something to th[at] effect."

Turetzky also he said that on August 15, as he came out of the office in the 70th Precinct in which he first spoke to investigators, he was "confronted" by another P.B.A. delegate from the precinct named Timothy Lee. According to Turetzky, Lee "appeared very upset with me," and said, " 'What are you doing in there?' And I said, 'You know what I'm doing in there.' And he said, 'why?' "

Internal Affairs officers then "cleared the precinct of anybody I may know" before escorting Turetzky from the building.

Also on August 15, Internal Affairs recovered the portion of the broomstick that Volpe had hidden in the Juvenile Room before assaulting Louima. The portion of the broomstick used in the assault was never recovered.

At approximately 7:30 p.m. on August 15, Schwarz was arrested and taken to Central Booking in Brooklyn, where he was held until Monday, August 18.

*Wiese's Statement to Immitt*

Before Schwarz's arrest, Wiese spoke with Michael Immitt regarding the events inside the 70th Precinct on August 9, 1997.

Immit testified that Wiese's story was substantially as follows. After Wiese and Schwarz brought Louima to the stationhouse, Schwarz searched Louima at the front desk. Schwarz "started to walk him away from the desk," and then Volpe arrived and "took control" of Louima in the front hallway near the desk.

Immit testified that according to Wiese, Volpe, acting alone, then "took Louima to the back of the precinct," while Wiese and Schwarz remained near the front desk. Wiese told Immitt that he briefly spoke to Bruder in the back of the precinct, then returned to the front desk area. Wiese also told Immitt that Schwarz remained near the front desk "in the front of the stationhouse" until they left together for the hospital.

*Schwarz's Statement to Immitt*

Immitt testified that he visited Schwarz at Central Booking on the night of August 15, and that Schwarz told him "basically the same story that Wiese did." Specifically, Schwarz told Immitt that he took Louima to the front desk, searched him and filled out paperwork, started to walk him away from the desk, and was confronted by Volpe, who wanted credit for the arrest.

Acording to Immitt, Schwarz said that "Volpe took the prisoner" toward the back of the precinct by himself. Immitt said he asked Schwarz whether he took Louima to the bathroom, and Schwarz said " 'absolutely not. Volpe, I know, walked away with that prisoner by himself.' "

Schwarz told Immitt that after Volpe left with Louima, he "stayed in the front of the stationhouse," according to Immitt. Immitt was asked at trial whether Schwarz indicated "that he never left the vicinity of the front desk," and Immitt answered, "Correct."

#### 5. August 16—18

*Bruder's First Statement*

In the afternoon of Saturday, August 16, Captain Kevin Gilmartin and Captain Den-

nis McManus of Internal Affairs interviewed Thomas Bruder at the College Point Auto Pound, where he was serving on modified duty.

Bruder's statements on this date paralleled what Wiese and Schwarz had earlier said to Immitt. Bruder told Gilmartin that he had seen "Officer Volpe take the prisoner, Abner Louima, from the desk area and head directly to the bathroom." Bruder said that Louima's pants were up at the time. Gilmartin did not specifically recall whether he asked Bruder if other officers accompanied Volpe and Louima, but said that Bruder insisted he had told Gilmartin everything he knew.

According to Gilmartin, Bruder said he then went into the Juvenile Room to process the paperwork for Louima's arrest. Approximately 15 minutes later, he entered the Arrest Processing Room and saw Louima in a holding cell. Bruder said he helped Louima up, found his shoe, and told him he would get an ambulance.

Bruder also told Gilmartin that he searched Louima in the Arrest Processing Room for any property that may need to be vouchered. Gilmartin testified that Bruder said "he removed [Louima's] wallet and inside [it] ... found an advertisement or a business card for an all male sex club," which he subsequently threw away.

*Media Coverage*

Also on August 16, 1997, the *New York Times* and the *New York Post* reported the federal investigation into the assaults on Louima. The *Daily News* reported that federal authorities might prosecute Volpe and Schwarz for civil rights violations.

Several newspapers also reported that an unidentified officer had spoken to investigators and identified Schwarz as the officer who had taken Louima toward the bathroom.

*Telephone Calls*

The newspaper reports of August 16 were inconsistent with what Schwarz and Wiese had told Immitt and what Bruder told state investigators, namely, that Volpe had acted alone in taking Louima to the bathroom. The government argued that these statements were part of the conspirators' initial strategy, in which they would say that Volpe acted alone; that Wiese and Schwarz, in consultation with Abbate and later joined by Bruder, devised a new strategy on August 16 and 17; and that the revised strategy was implemented through statements to investigators by Wiese on August 17 and by Bruder on August 18 and November 8.

After the newspaper reports appeared on August 16, there was a series of calls to and from Wiese and other officers at the 70th Precinct. Indeed, on August 16 alone, telephone records showed thirteen phone calls among Schwarz, Bruder, Wiese and Abbate. The first two were placed from Wiese's cell phone to Abbate's home phone roughly five hours after Schwarz's arrest.

At 1:48 p.m., while Bruder was giving his first statement to state investigators, a thirty-nine minute phone call was placed from a phone used by Wiese to Abbate's home phone, one of five calls between phones used by Wiese and Abbate that day. Immediately after this call, two calls were placed from Wiese's phone to the phone used by Schwarz in Central Booking.

A fourteen-minute call was placed from the phone used by Schwarz in Central Booking to Abbate's home phone at 5:50 that afternoon, when the officer in whose office the phone was located was on a meal break. Later that evening, a twenty-two-minute call was placed between a phone used by Wiese and the phone used by Schwarz in Central Booking. These were followed immediately by two calls, each lasting one minute or less, between Wiese's phone and Abbate's home phone.

Abbate said that Wiese called him that day in part to discuss what Wiese would say in his interview with state investigators the following day.

### 6. August 17

Early on the morning of August 17, 1997, Schofield told Internal Affairs investigators that, on the morning of August 9, Volpe had borrowed leather gloves from him and returned them covered with blood.

*Wiese's Statement to Internal Affairs*

Also on August 17, Wiese gave a statement to representatives of the King's County District Attorney's Office and Internal Affairs. Before the interview, Wiese's attorney negotiated a proffer agreement under which the District Attorney agreed not to use Wiese's statements against him except in a prosecution for perjury or obstruction of justice. Wiese was granted no immunity from Police Department proceedings.

Deputy Inspector Burns was present at Wiese's proffer session. He testified that Wiese gave substantially the following story.

As Schwarz searched Louima, filled out the pedigree card and counted Louima's cash at the front desk, Wiese and Volpe argued over who would get credit for the arrest. Sergeant Michael Bellomo intervened and gave the arrest to Volpe.

Wiese and Volpe then led Louima away from the desk together. As they neared the cell area, "Volpe pulls on Abner Louima, makes a very sharp right and all of a sudden starts heading off towards the bathroom . . . and ultimately into the bathroom." Volpe told Wiese that "he wanted to clean up the prisoner," according to Burns. The stationhouse dog, named "Midnight," "tried to follow Officer Volpe into the bathroom, but Officer Wiese stopped the dog in front of the bathroom."

According to Burns, Wiese said that shortly after Volpe and Louima entered the bathroom, Wiese heard a "scuffle" inside, and "the sound of a body hitting the floor . . . once and then twice more immediately after that." Wiese said that he thought "maybe Officer Volpe was 'tuning up' Abner Louima."

After hearing these sounds, Wiese remained outside the bathroom door "petting Midnight the dog" for a period of "about two minutes," according to Burns. When questioned by Burns, Wiese stated that "it could have been a little less than two minutes."

Wiese then opened the bathroom door and went inside, along with the dog. Once inside, he "cried out" to Volpe, saying "'what are you, crazy? What's going on?'" Wiese saw Louima "handcuffed [and] face down on his belly on the floor of the bathroom with his head between the toilet . . . and the wall." Volpe stood over Louima with his foot on Louima's back, "bending down in a crouched position holding a stick in his hands."

Louima's pants and underwear were below his knees, and Wiese saw feces but no blood on Louima's buttocks. Volpe said to Wiese, "'he shit his pants; he shit himself,'" according to Burns.

Burns said he asked Wiese "a series of questions regarding Officer Volpe's hands." He asked Wiese "maybe five to seven different ways" what he saw. Wiese said that he could see Volpe's hands, fingers and palms, and that he could not see blood on Volpe's hands or fingers or under his fingernails. "Mr. Wiese's attorney asked . . . specifically, 'did Officer Volpe have gloves on in the bathroom,' to which Officer Wiese responded, 'no.'"

Wiese then went to Louima, "grabbing [him] by either the ankles or the calves . . . and pulling him out . . ., lifting [him] up while he was still rear handcuffed . . . and pulling him to his feet."

Wiese was leading Louima out of the bathroom when he heard something, turned around, and saw Volpe "with his hand on Abner Louima's neck and chin with Abner against the right wall and Volpe holding the stick . . . by Abner Louima's mouth." Wiese grabbed Louima and again began heading for the door when "he hears . . . the sound of a punch being

thrown, ... turns around again and sees [Louima] crumpled over, hunched over and now crying, and [Volpe] with his fist sort of like in [Louima's] belly or stomach area."

Volpe then "took the stick and flung it ... [into] the metal garbage can." Wiese said the stick did not make a noise as it landed.

Wiese finally led Louima out of the bathroom and walked him "to the right and into the Arrest Processing Room," with he and Volpe each holding one of Louima's arms.

Wiese left the Arrest Processing Room and returned to the vicinity of the front desk. He told the investigators that Schwarz was "still at the desk doing what he had been doing before with the pedigree [card] and the money." According to Burns,

> On all occasions when he was asked or volunteered where Officer Schwarz was physically in the stationhouse, Officer Wiese puts Officer Schwarz at the desk doing the counting of the funds, the obtaining the pedigree information ... or things that Sergeant Fallon would need for transposing the [command log].

According to Wiese, he did not see Schwarz leave the front desk area "until they went to the hospital."

Wiese said that while he and Schwarz were driving to the hospital, "he told [Schwarz] what happened in the bathroom, but he may not have told him about the stick and the feces."

Wiese also said that at the hospital, Volpe told him that he "got a little carried away," and stated that "that's the second guy I made shit his pants."

Wiese said that when he and Schwarz saw "suits"—meaning Internal Affairs investigators—in the stationhouse on the morning of August 11, 1997, he guessed that they were looking into what had occurred inside the bathroom. When he and Schwarz went back out on patrol that morning, Wiese told Schwarz what he had

seen in the bathroom, "and this time he tells him about the stick and the feces. He doesn't leave anything out."

*Bruder's Second Statement*

On Monday, August 18, 1997, Bruder's attorney approached Captain Gilmartin to discuss a possible proffer agreement similar to that entered into by Wiese on the previous day. Bruder's attorney told Gilmartin that Bruder could provide certain information regarding the events of August 9, 1997. The proffered version was different in critical respects from Bruder's statement of August 16, and similar in key respects to Wiese's statement of August 17.

The parties stipulated that Bruder's attorney offered substantially the following story. "Bruder had observed Volpe and Wiese escorting Louima toward the bathroom." Bruder also saw "Volpe go into the bathroom with Louima while Wiese waited outside near the bathroom door playing with a stray dog."

"[S]ometime later Bruder was told by Volpe that Volpe had struck Louima in the ass with a stick." When Gilmartin asked Bruder's attorney what kind of stick Volpe had spoken about, the attorney left to speak with his client. He returned and told Gilmartin that it was a "mop handle."

Bruder claimed that before he saw Volpe and Wiese escorting Louima into the bathroom, the dog "defecated on the floor outside the bathroom and Bruder cleaned it up with a mop and put the mop against [a wall] near the bathroom."

7. August 25 through November 8

On August 25, 1997, Internal Affairs closed its investigation into the assaults on Louima.

On August 27, 1997, the federal grand jury was empaneled.

On November 6, 1997, Special Agent DeFilippo served Bruder with a grand jury subpoena seeking his memo book from August of 1997.

Between August 18 and November 15, 1997, there were 106 calls between phones used by Wiese, Schwarz, Abbate and Bruder.

There are no records of any calls between Abbate and Bruder. But between August 9 and February 28, 1997, there were 118 calls between phones used by Wiese and Bruder on the same day as, and often within a few minutes or hours of, calls between phones used by Wiese and Abbate. Of these, twenty-eight calls occurred before November 8, 1997.

*Bruder's Third Statement*

On November 8, 1997, Bruder made his third statement regarding the events of August 9, this time to F.B.I. agents and representatives of the United States Attorney for the Eastern District of New York. Bruder's statement of November 8 was substantially the same as his August 18 statement and Wiese's August 17 statement.

Special Agent DeFillipo testified that Bruder stated in substance the following:

Louima was being escorted by Officers Volpe and Wiese towards the bathroom in the back of the stationhouse. As they approached the bathroom, Volpe escorted Louima into the bathroom and Wiese stepped to the rear so they could enter . . . and either lagged behind or stayed in the doorway, but then Bruder entered the Juvenile Room and lost sight of him

As Louima was led toward the bathroom, his pants were "in a standard regular position, up at his waist."

A short while later, according to DeFilippo, "Volpe stated to Bruder, and I quote, 'I whacked him in the ass with a mop handle.' "

Bruder then went into the cell area, saw Louima on his knees with his pants down. Louima "appeared to be 'cracked up,' and drunk, and his front teeth were missing."

Bruder also said that Louima's property included "a yellow and black promotion card that bore 'pictures of guys with no shirts,' and it was an advertisement for an 'all-male revue.' " Bruder said he threw the card out.

Agent Joseph Foelsch served Bruder with a subpoena on December 30, 1998, seeking "(1) items belonging to Abner Louima or (2) items taken, seized or otherwise removed from Abner Louima on or about August 9, 1997." Foelsch testified that Bruder told him, "Anything I took I vouchered. I don't have anything."

### C. Indictment and Trial

The federal grand jury returned an indictment on February 26, 1998, and a superceding indictment on March 3, 1998. Volpe, Schwarz, Bruder and Wiese all voluntarily surrendered to the F.B.I. on February 26, 1998.

The first trial began on May 4, 1999. Justin Volpe pleaded guilty to six counts of the superceding indictment on May 25, 1999. On June 2, 1999, the jury found Schwarz guilty of participating and conspiring with Volpe to participate in the sexual assault of Louima, and found Schwarz, Wiese and Bruder not guilty of the car assaults.

The second trial of Schwarz, Bruder and Wiese began on February 7, 2000. Only Count Twelve of the superceding indictment, which charged the defendants with conspiring to obstruct justice, was at issue. The jury found all three guilty of Count Twelve on March 6, 2000.

*Schwarz's Trial Testimony*

Schwarz gave his only sworn statement regarding the events of August 9, 1997 in testimony at the second trial.

As noted, Schwarz said that during the incident outside Club Rendez–Vous, Louima "struck me on the side of my head with his fist," and that he, Schwarz, injured his left hand while trying to place Louima in handcuffs.

Upon arrival at the precinct, Wiese "pulled Mr. Louima out of the car," and then Schwarz and Wiese led Louima into the precinct together.

As Schwarz searched Louima at the front desk, Louima's pants "dropped down to about his hip area or so," but Louima's buttocks were never exposed. Schwarz said he "had some difficulty" filling out the pedigree card "because I injured my hand out in the street."

Schwarz said that when Louima was led away from the desk, "I was filling out the pedigree sheet," and that he did not finish his paperwork until after Louima had left the desk. Asked who took Louima from the desk, Schwarz said "I think it was Tommy Wiese. I can't say 100 percent, but I think it was him."

After completing the pedigree card and counting Louima's money, Schwarz had a brief conversation with Sergeant Bellomo near the front desk regarding Schwarz's shirt, which had been ripped during the arrest of Louima.

Schwarz said he "was never in that bathroom" with Louima and Volpe and did not lead Louima to the back of the station-house. Instead, Schwarz said, he "left the precinct and went out to the [patrol] car" to search for weapons or contraband Louima may have left behind. Despite his injured hand, Schwarz said he lifted the car seats during the search. Schwarz said he did not see anyone else when he went outside or during his search.

Schwarz noted that police regulations require such a search every time officers transport a prisoner in their patrol car. The Patrol Guide requires the "recorder," or passenger, rather than the driver, to conduct this search, and to do so "immediately" after the conclusion of the trip.

Schwarz then went back into the precinct to find Wiese and go to the hospital. "When I got in, Tommy ... was behind the desk ... grabbing some paperwork."

During the drive to the hospital, Schwarz said he spoke to Wiese regarding Volpe's behavior outside Club Rendez–Vous, but did not discuss events inside the precinct bathroom.

*Volpe's Testimony*

Volpe's testimony at trial regarding events inside the precinct was substantially as follows.

Volpe encountered Wiese leading Louima away from the front desk. Volpe approached and said " 'I got him' and I put my arm on Mr. Louima and I took control of him." Schwarz "was still at the front desk" at that point.

Volpe then led Louima toward the cell area, but "instead of proceeding straight into the Arrest Room ..., I brought Mr. Louima into the bathroom." Volpe did not recall telling Wiese that he wanted to wash Louima up. Wiese followed them into the bathroom.

Inside the bathroom, Volpe pushed Louima against the wall and asked him why he had cursed and punched Volpe outside the nightclub. Volpe claimed that Louima, whom he had already assaulted and who was handcuffed with his pants down, "responded with 'fuck you.' " Volpe punched Louima in the chest, asked again why he had punched him, and Louima allegedly "said 'fuck you' again."

Volpe then threw Louima to the floor between a toilet and the wall. He said he did not remember kicking Louima, that he did not threaten Louima before assaulting him, and that "no one put their foot on or in [Louima's] mouth."

With Louima lying on the bathroom floor, Volpe picked up the broken end of the broomstick he had hidden behind the garbage can and "placed [it] near his [bare] buttocks, thinking that would scare him somehow to respond to my questions." Standing over Louima, Volpe "looked him in the face and ... asked him one more time, 'do you have anything to say?' And he mumbled something that I didn't quite understand but I took it as ... an aggressive tone.'"

Volpe said, "I tensed up and I pushed the stick into his rectum." When Volpe pulled the stick out and saw feces and blood, he "held the stick to Louima's face

to say 'look what happened .... Look what you made me do.' And he didn't respond .... I threw the stick down and I picked him up and escorted him out of the bathroom."

According to Volpe, Wiese was inside the bathroom throughout the assault, along with the dog, and did nothing to stop or assist Volpe. Volpe said, "He didn't do anything.... He never spoke. He never touched Louima." Volpe said he acted alone, and that no one lifted Louima by the handcuffs or held him up during the sexual assault. "The whole time during the assault, [Louima] was lying on his stomach," said Volpe. But Volpe admitted that Louima's pants were down below his knees lower so that he could not spread his legs.

"Officer Schwarz was not in the bathroom with me at any point during the assault," according to Volpe.

At his plea allocution on May 25, 1999, Volpe said that "in the presence of another officer, I sodomized Mr. Louima by placing a stick in his rectum." The other officer

> saw what was going on, did nothing to stop it. It was understood from the circumstances that that police officer would do nothing to stop me or report it to anyone.

Volpe did not identify the other officer during his plea allocution.

After the assault, Volpe and Wiese led Louima out of the bathroom, and Volpe took him into the Arrest Processing Room and put him in a cell. Before they arrived, Volpe told Louima, "if you say anything about what happened, I will find you and I will kill you."

## II. Schwarz's Sentence

Schwarz was found guilty in the first trial of Counts One and Four of the indictment, which charged him with conspiring with Volpe to violate Louima's civil rights and violating Louima's civil rights, respectively. On Count Four, the jury expressly found Schwarz guilty of both striking and sexually assaulting Louima.

A separate jury found Schwarz guilty in the second trial of Count Twelve of the indictment, which charged a conspiracy to obstruct justice with respect to the sexual assault.

The Probation Department calculated Schwarz's total offense level for all three counts of conviction to be forty-six. The sentence prescribed by the Guidelines for any offense level at or above forty-three is imprisonment for life. *See* U.S.S.G., Ch. 5, Pt. A.

For the reasons hereafter recited, the Court finds that such a sentence would be far in excess of what is appropriate.

### A. The Presentence Report

The Probation Department calculated Schwarz's offense level for Counts One and Four as follows. The guideline for 18 U.S.C. §§ 241 and 242, the statutes under which he was convicted, is § 2H1.1. The base offense level under that section is derived from the guideline for the "underlying offense," namely, criminal sexual abuse. *See* U.S.S.G. § 2H1.1(a).

The guideline for that underlying offense is § 2A3.1, carrying a base offense level of twenty-seven. *See id.*, § 2A3.1(a). To this level, the Probation Department added fifteen levels, that is, four levels because the sexual abuse was committed by force; two levels because Louima was under arrest and in the custody of Schwarz and Volpe; three levels because of the extent of Louima's injuries; and six levels because Schwarz was, a public official or acting under color of law. *See id.* §§ 2A3.1(b)(1); 2A3.1(b)(3)(A); 2A3.1(b)(4)(C); 2H1.1(b)(1).

The Probation Department also added two adjustments pursuant to Chapter Three of the Guidelines: a two-level "victim-related adjustment" because Louima was in handcuffs; and two levels because Schwarz was found guilty of conspiring to obstruct justice during the investigation or prosecution of the offense. *See* U.S.S.G. §§ 3A1.3, 3C1.1 and comment. (n.8).

### B. Schwarz's Objections

Schwarz objects to various parts of his offense level as determined by the Presentence Report. The Court considered and rejected several identical objections made by Justin Volpe in its memorandum and order setting forth Volpe's sentence. *See United States v. Volpe II*, 78 F.Supp.2d 76, 82–87 (E.D.N.Y.1999).

#### 1. "Offense Conduct"

Schwarz objects to the Presentence Report's description of his role in the offense "to the extent that it is inconsistent with the evidence, his trial testimony[,] and ... his acquittals [in the first trial] on Counts Two and Three of the indictment."

In a written statement submitted to the Probation Department, Schwarz asserted that he is "totally innocent" of the assault and conspiracy, and blamed his conviction on the denial of his rights "by [the Court] and ... the misconduct of the Internal Affairs Bureau, the F.B.I., and the United States Attorney's Office."

After the first trial, Schwarz moved to set aside the verdict on Counts One and Four, in part because he alleged that the verdict was against the weight of the evidence. The Court denied the motion, finding that "[t]he record contains more than ample evidence to support the jury's finding of guilt." *United States v. Volpe (I)*, 62 F.Supp.2d 887, 893 (E.D.N.Y.1999). Schwarz offers no new reason to reach a different conclusion.

In the same decision, the Court rejected several of the challenges to the verdict that Schwarz raises anew in his statement to the Probation Department. *See id.* at 890–94.

Schwarz's objection with respect to Counts Two and Three is moot. The factual summary in this opinion incorporates his acquittal on those counts, which consequently play no role in determining Schwarz's sentence.

#### 2. Obstruction of Justice.

Schwarz objects "to the conclusion that [he] obstructed the investigation of the sexual assault," and to the resulting two-level enhancement for obstruction of justice under § 3C1.1.

The jury found Schwarz guilty of conspiring to obstruct justice as charged in Count Twelve. The facts of record support that verdict. Because the first jury found Schwarz guilty of taking part in the sexual assault, application of the obstruction adjustment is not only appropriate but mandatory. *See* U.S.S.G. § 3C1.1 and comment.(n.8).

Schwarz also objects to the Probation Department's conclusion that he committed perjury at the second trial and the resulting two-level enhancement to the offense level for that count. He further argues that the Probation Department erred by adding two levels for victim restraint to the offense level for Count Twelve.

In calculating Schwarz's total offense level, Count Twelve has been grouped under the Guidelines with the sexual assault counts so that Schwarz's sentence is determined almost entirely by the sexual assault counts. Adjustments for perjury and victim restraint for Count Twelve would not affect his sentence. The Court need not determine whether Schwarz perjured himself.

#### 3. The Sexual Assault Guideline

Schwarz objects to the application of the Guideline for Criminal Sexual Abuse, § 2A3.1, "in that the bathroom assault was not 'sexual.'" The Court rejected this argument in sentencing Volpe because the argument "both ignores the text of the relevant statute and distorts the nature of sexual assault." *Volpe II*, 78 F.Supp.2d at 86. Schwarz offers no reason to reach a different conclusion with respect to his sentence.

The jury found that Schwarz helped Volpe to sodomize Louima with the admitted purpose of humiliating him. Applica-

tion of the sexual abuse guideline is plainly proper. *See* U.S.S.G. § 2A3.1, comment. (guideline applies to sexual abuse under 18 U.S.C. § 2241); 18 U.S.C. § 2246(2)(C) ("sexual abuse" for purposes of § 2241 includes "penetration ... of the anal ... opening of another ... by any object with the intent to abuse, humiliate, harass, [or] degrade").

### 4. "Under Color of Law"

■ Schwarz argues that the six-level adjustment under § 2H1.1(b)(1) is inapplicable "because the bathroom assault on Abner Louima was not 'under color of law,' " but was "a 'personal pursuit' of Justin Volpe." Schwarz cites no authority to support this argument.

■ In any event, the enhancement applies if "(A) the defendant was a public official at the time of the offense; *or* (B) the offense was committed under color of law" (emphasis added). *See United States v. Livoti*, 196 F.3d 322, 327 (2d Cir.1999) ("public official" and "under color of law" constitute "wholly independent ground[s]" for application of six-level enhancement under § 2H1.1(b)(1)). Both Schwarz and Volpe admittedly were police officers at the time of the offense.

Second, Count Four of the indictment to which Volpe pleaded guilty and of which Schwarz was found guilty, expressly alleged that the assault was committed under color of law. And the evidence shows overwhelmingly that both Volpe and Schwarz abused power conferred on them by state law during the assault. *See United States v. McDermott*, 918 F.2d 319, 325 (2d Cir.1990).

Third, even if the sexual assault was a "personal pursuit" from Volpe's standpoint, Schwarz played a role in that pursuit, and was both a police officer and acting under color of law when he did so. The adjustment applies to him independently.

### 5. Double Counting

Schwarz also urges that several aspects of the Guidelines calculation constitute "double counting." He argues that the enhancements for the following offense characteristics all duplicate one another in various combinations: (i) that Louima was in police custody; (ii) that the sexual assault was committed through the use of force; (iii) that Schwarz was a police officer or acting under color of law; and (iv) that Louima was in handcuffs. *See* U.S.S.G. §§ 2A3.1(b)(3)(A); 2A3.1(b)(1); 2H1.1(b)(1); 3A1.3.

Schwarz again provides no explanation and cites no authority to support any of these arguments. Volpe raised nearly identical objections, and the Court rejected all of them, holding that:

> Each of the guidelines at issue addresses an entirely distinct aggravating factor: the color-of-law adjustment punishes Volpe's acting improperly as a police officer; the in-custody adjustment punishes the abuse of his power over an individual in an officer's control, namely Louima; the restraint adjustment reflects Louima's helplessness; and the use-of-force adjustment reflects the violence and depravity of Volpe's sexual abuse....

*Volpe II*, 78 F.Supp.2d at 85–86, *citing United States v. Rosario*, 7 F.3d 319, 321 (2d Cir.1993) (§ 3A1.3 adjustment does not constitute double counting "as long as restraint is not an element of the primary offense for which the defendant is being sentenced"); *United States v. Hershkowitz*, 968 F.2d 1503, 1505 (2d Cir.1992) ("that a defendant is acting under color of law does not necessarily contemplate a victim who is in custody and under defendant's control"); *United States v. Clayton*, 172 F.3d 347, 353 (5th Cir.1999) (lawful restraint of victim by police is "aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime"); U.S.S.G. § 2A3.1, comment. (guideline includes separate enhancements for abuse through force and abuse of prisoner).

Schwarz conspired with and aided Volpe in committing each of the elements that triggered these adjustments and, with the exceptions discussed below, he is required to be sentenced accordingly.

C. Schwarz's Role in the Offense

■ As noted above, Schwarz was convicted of conspiring with and aiding Volpe in the sexual assault of Abner Louima. The Guidelines provide that a defendant's sentence "shall be determined on the basis of ... all acts ... aided [and] abetted ... by the defendant; and ... all reasonably foreseeable acts ... of others in furtherance of [a] jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1).

Whether Volpe's acts were reasonably foreseeable or in furtherance of a jointly undertaken crime is immaterial, at least in terms of determining the base offense level: the foreseeability requirement "does not apply to conduct that the defendant aids [or] abets." *Id.* § 1B1.3, comment (n.2).

In addition, under § 2X2.1, the offense level for aiding and abetting "is the same level as that for the underlying offense."

The Guidelines thus require that, absent adjustments or departures unique to Schwarz, his offense level for the sexual assault should be the same as Volpe's.

1. Minor Role Adjustment

While a defendant convicted of aiding and abetting is punishable as a principal, "[a]n adjustment for a mitigating role [under § 3B1.2] may be appropriate." U.S.S.G. § 2X2.1 comment. (backg'd). Section 3B1.2 allows a four-level adjustment for "minimal participants" and a two-level decrease for "minor participants."

■ A "minor participant" is one who is "less culpable than most other participants, but whose role could not be described as minimal." *See* U.S.S.G. §§ 3B1.2(b) and comment. (n.3). In determining whether this adjustment applies, the Court considers the defendant's conduct "vis-a-vis the role of his co-conspira-

tors" and "in comparison to the average participant" in the offense described by the applicable guidelines. *United States v. Ajmal,* 67 F.3d 12, 18 (2d Cir.1995); *see* U.S.S.G. § 3B1.2, comment. (n.3 and back'd) ("minor participant" is "less culpable than most other participants" and "than the average participant").

Among the pertinent considerations are the defendant's "relationship to other participants, the importance of [his] actions to the success of the venture, and [his] awareness of the nature and scope of the criminal enterprise." *United States v. Garcia,* 920 F.2d 153, 155 (2d Cir.1990) (citations and internal quotations omitted). "[T]he dispositive consideration [is] culpability in the context of the facts of the case." *United States v. Pena,* 33 F.3d 2, 3 (2d Cir.1994) (internal quotations omitted); U.S.S.G. § 3B1.2, comment. (backg'd).

■ While it is a close call, the Court finds that Schwarz is entitled to a two-point reduction under § 3B1.2(b) as a minor participant. It is true that Schwarz played an active role in the offense. Having been ordered to take Louima to a holding cell, Schwarz took him instead in the direction of the bathroom, with Louima's pants below his knees. Once inside, Schwarz put his foot on Louima's mouth to silence him when he cried out after Volpe kicked him in the groin, and then lifted him by the handcuffs and held him in position while Volpe sodomized him.

But Schwarz's culpability must be gauged in comparison to Volpe's, and to the "average participant" in criminal sexual abuse. *Ajmal,* 67 F.3d at 18. And as to that conduct, which defines this case for purposes of the Guidelines, Volpe was clearly more culpable than Schwarz. As the Court previously noted, in planning and carrying out the sexual assault

Volpe acted methodically and deliberately: he arrived at the precinct, saw Louima, found a broomstick, broke it in half and stashed one section in the bathroom, borrowed a pair of gloves, returned to

the bathroom, taunted, beat and kicked Louima, told him not to yell, rammed the stick into Louima's rectum, waved the feces-covered stick in Louima's face, then left the bathroom and returned the gloves.

*Volpe II,* 78 F.Supp.2d at 91. After the assault was complete, Volpe twice threatened to kill Louima and his family, and later "boasted to fellow officers that he 'broke a man down' and 'took a man down,' and then proudly showed off the feces-stained broom handle." *Id.* at 91–92.

Of course, Schwarz should have known Volpe's intent by the time of the sexual assault. Louima at that point lay on the floor, bloodied and handcuffed, with his pants at or below his knees, as Volpe picked up the broken end of a broomstick from behind a trash can. It is difficult to fathom what Schwarz expected would happen, other than what did happen, when he lifted and held Louima.

But there is no evidence that Schwarz acted with the same degree of foresight and planning as Volpe. Nor did he taunt or threaten to kill Louima, or gloat about his actions in front of fellow officers.

To the extent that Schwarz did intend to participate in the sexual assault, it was Volpe who carried out that assault with enough force to puncture Louima's rectum and bladder, thereby incurring the three-level adjustment for serious bodily injury.

Schwarz was also less culpable than "the average participant" in the "criminal activity," *see* U.S.S.G. §§ 3B1.2(b) and comment. The "criminal activity" at issue, from a Guidelines perspective, is criminal sexual abuse committed through the use of force by a police officer on a handcuffed prisoner, resulting in serious bodily injury. *See United States v. Cambrelen,* 29 F.Supp.2d 120, 127 (E.D.N.Y.1998) (culpability of "average participant" determined with reference to specific offense punished by applicable guidelines); U.S.S.G. § 3B1.2, comment. (backg'd) (availability of adjustment "is heavily dependent upon the facts of the particular case."). Again, there is no evidence that Schwarz himself planned or committed the defining act, nor was he entirely complicit in its severity.

The terminology of § 3B1.2 is somewhat misleading in this context. The Guideline is entitled "Mitigating Role," and those entitled to a two-point reduction under subsection (b) are classified as "minor participants." Yet Schwarz's behavior obviously facilitated rather than mitigated the crimes against Louima. And his role "minor"only in comparison to the role of Volpe or the "average participant" in the core conduct, that is, the sexual assault.

But § 3B1.2 mandates just such a comparative judgment. *See* U.S.S.G. § 3B1.2, comment (n.3 and backg'd); *Ajmal,* 67 F.3d at 18; *Pena,* 33 F.3d at 3. Based on all the facts, Schwarz is entitled to an adjustment under this section.

### 2. Extraordinary Impact on Offense Level

■ A downward departure may sometimes be warranted in addition to or instead of a mitigating role adjustment. *See United States v. Restrepo,* 936 F.2d 661, 667 (2d Cir.1991) (upholding four-point departure beyond minimal role adjustment); *United States v. Alba,* 933 F.2d 1117, 1121–22 (2d Cir.1991) (same); *see also United States v. Speenburgh,* 990 F.2d 72, 75–76 (2d Cir.1993) (defendant's lesser role in offense may justify departure even where § 3B1.3 adjustment technically unavailable); *United States v. Stuart,* 22 F.3d 76, 83–84 (3d Cir.1994) (court may depart where guidelines level based on third-party conduct "overstated [defendant's] criminal culpability," even where § 3B1.2 adjustment is unavailable).

■ A sentencing court normally may depart under § 5K2.0 only where it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.

■ "The Court may not depart solely because the overall Guidelines range appears too high or the sentence too severe." *Volpe II*, 78 F.Supp.2d at 90, *citing United States v. Chabot,* 70 F.3d 259, 260 (2d Cir.1995); *see* § 5K2.0, comment. Similarly, the Court may not depart solely because "the applicable range punishes the defendant too severely *compared to a co-defendant,*" even where the co-defendant was "more responsible" for the offense. *United States v. Joyner,* 924 F.2d 454, 460 (2d Cir.1991) (emphasis added).

The Sentencing Commission considered the extent to which a sentence should reflect a defendant's culpability for the conduct of others. *See* U.S.S.G. §§ 1B1.3, 2X2.1, 3B1.2, 5H1.7.

But a departure may be available "even though the reason for departure is taken into consideration in determining the guideline range ... if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive." *Id.,* § 5K2.0; *Koon v. United States,* 518 U.S. 81, 95–96, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996).

■ Thus, "though limited participation in the offense is a factor taken into consideration by the Sentencing Commission," a departure may be justified under "unusual circumstances." *Alba,* 933 F.2d at 1121.

■ In particular, a departure may be justified to supplement a limited role adjustment where "an offense level has been extraordinarily magnified by a circumstance that bears little relation to the defendant's role in the offense." *Restrepo,* 936 F.2d at 667.

In *Restrepo,* several defendants pleaded guilty to money laundering. Although they played only small roles relative to, and were unaware of, the size of the operation, their offense levels were increased by nine points because of the amount of money involved. The district court granted a four-level minimal role reduction and de-

parted by an additional four points because the Guidelines "do not ... adequately appreciate ... the different roles of the defendants." *Id.* at 666.

The Second Circuit affirmed. The court acknowledged that the defendant's conduct precisely matched an example of a "minimal participant" provided in commentary to § 3B1.2. But the court held that § 3B1.2 "does not address the spiralling effect that the amount of cash had on these defendants." *Id.* at 668.

The critical factor in *Restrepo* was thus not merely the defendants' limited role in the offense, but the "spiralling effect" upon their Guidelines level of "a circumstance that [bore] little relation to the defendant's role in the offense." *Id.* at 667, 668.

Similarly, in *Alba,* a defendant convicted of drug trafficking faced a sentenced increased by several points because of the weight of narcotics involved. The court upheld a departure because the defendant played only a small role in the sale, and indeed was unaware he was involved in a drug transaction until "shortly before the incident." *Alba,* 933 F.2d at 1121. In these circumstances, "the Sentencing Guidelines do not adequately reflect [the defendant's] actual behavior." *Id.; see also United States v. Lara,* 47 F.3d 60, 65–66 (2d Cir.1995) ("high-end sentences may overrepresent culpability and justify a departure," even where no mitigating role adjustment is awarded and where defendant could have foreseen full range of conduct reflected in offense level); *Stuart,* 22 F.3d at 83–84 (court may depart where offense level overstates culpability due to external circumstances, even where defendant's conduct renders him ineligible for § 3B1.2 adjustment).

■ The Court finds that the facts of this case justify a two-level downward departure in addition to the two-level limited role adjustment. However brutal Schwarz's conduct, it was at root Volpe's actions that pushed the offense level for this crime into the upper ranges of the

guidelines. Simply put, Volpe, and not Schwarz, wielded the stick, and did so with a truly shocking degree of force.

By way of comparison, were Schwarz to be sentenced for aiding and abetting a mere aggravated assault rather than criminal sexual abuse, the base offense level would be fifteen rather than twenty-seven. *Compare* U.S.S.G. § 2A2.2(a) (aggravated assault), *with* § 2A3.1(a) (criminal sexual abuse).

Even if the other aggravating factors were still present—namely, assault of a handcuffed prisoner by a police officer using a weapon that caused a degree of injury falling between serious and life-threatening, combined with obstruction of justice—Schwarz's total offense level would be thirty-four rather than forty-six. *See* U.S.S.G. §§ 2A2.2(a) (base offense level for aggravated assault is fifteen); 2A2.2(b)(2) and 1B1.1, comment. (n. d) (four-level enhancement for use of weapon "capable of inflicting ... serious bodily injury"); 2A2.2(3)(E) (five-level enhancement for bodily injury between serious and life-threatening); 2H1.1(b)(1) (six-level enhancement for deprivation of civil rights by public official or under color of law); 3A1.3 (two-level victim restraint enhancement); 3C1.1 (two levels for obstruction of justice).

The maximum sentence for an offense level of thirty-four is just over fifteen years, while the minimum sentence at level forty-six is life imprisonment. *See id.* at Ch. 5, Pt. A.

The sexual nature of the assault thus had a "spiralling effect" on Schwarz's offense level and sentence. *Restrepo,* 936 F.2d at 668. It is this factor that removes this case from the "heartland" of the applicable Guidelines and justifies a departure.

To be clear, this departure is not premised on a finding that Schwarz was an unimportant or accidental participant in Volpe's conduct. As discussed, he clearly played an active role, and the jury specifically found him guilty of participating in the sexual assault. *Cf. Restrepo,* 936 F.2d at 666–68 (upholding four-point departure and four-point minimal role adjustment where circumstance magnifying offense level had "little relation" to defendants' conduct).

But a twelve-level increase in his offense level, which removes the Court's discretion to impose any sentence short of life imprisonment, is simply disproportionate to his culpability for the sexual assault and for the extent of Louima's injuries. *See Lara,* 47 F.3d at 65–67 (recognizing that departure may be appropriate where "high-end sentences ... overrepresent culpability"); *see also Restrepo,* 936 F.2d at 667; *Stuart,* 22 F.3d at 83. It is evident that, in drafting the applicable Guidelines, the Sentencing Commission did not envision the dramatic inflation that Volpe's extreme viciousness would have on Schwarz's offense level. *See Restrepo* at 668.

Even after the adjustment under § 3B1.2 and the two-point departure under § 5K2.0, Schwarz's remaining offense level, before other departures, is forty-two. This is eight levels above what it would be had there been an aggravated assault rather than a sexual assault, and up to thirteen levels more than it would be had Louima's injuries in an aggravated assault been less severe. Put differently, Schwarz's offense level, before other departures, more than doubles and perhaps triples his minimum term of imprisonment from that applicable to aggravated assault under analogous circumstances. An offense level of forty-two properly reflects Schwarz's culpability for all of the events inside the bathroom.

### C. Schwarz's Departure Motions

#### 1. Susceptibility to Abuse

In sentencing Justin Volpe, the Court departed downward because it found that Volpe faced unusually harsh or restrictive conditions of imprisonment. *See Volpe II,* 78 F.Supp.2d at 87–89; *see also Koon v. United States,* 518 U.S. 81, 112, 116 S.Ct. 2035, 2053, 135 L.Ed.2d 392

(1996). In particular, the Court found that "[t]he extraordinary notoriety of this case and the degree of general opprobrium toward Volpe ..., coupled with [his] status as a police officer," left him "unusually susceptible to abuse in prison." *Volpe II*, 78 F.Supp.2d at 89. The court also found that Volpe "could serve a substantial portion of his sentence in some form of segregation" in order to be shielded from abuse. *Id.*

The Court concludes that Schwarz is entitled to a two-level departure on the same grounds. The publicity surrounding Schwarz's trial and conviction was as intense as that surrounding Volpe's, and the nature of the crime has not faded from view. In addition, Schwarz, like Volpe, has been in various forms of segregation since his first conviction in June of 1999, and there is little prospect that the threat to his security will soon diminish. *See id.*, 78 F.Supp.2d at 89.

2. Other Offender Characteristics

 A defendant's employment record, family ties and responsibilities, military service, and employment-related contributions are "not ordinarily relevant" in determining whether a departure is warranted. *See* U.S.S.G. §§ 5H1.5, 5H1.6, 5H1.11.

 But such "discouraged" factors may warrant a departure when present "to an exceptional degree or in some other way [that] makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. at 2045; *see* U.S.S.G. § 5K2.0; *United States v. Broderson*, 67 F.3d 452, 458–59 (2d Cir. 1995). In addition, the Court "may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the 'heartland' cases covered by the guidelines." *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir.1996); *see* U.S.S.G. § 5K2.0, comment.

 Several aspects of Schwarz's background and family circumstances combine to justify a departure. First, before his conviction Schwarz played an important role in caring for his brother, John Schwarz, who is a quadriplegic. Schwarz stepped down from his position with the elite Anti–Crime Unit and arranged to work the midnight shift at the 70th Precinct to make himself available to transport his brother to physical therapy. Schwarz also served as care giver to his brother every night. Schwarz's mother now serves as a care giver, but cannot lift John on her own. *Cf. Alba*, 933 F.2d at 1122 (approving departure based in part on defendant's role in caring for "disabled father who depends on [defendant] to help him get in and out of his wheelchair").

Second, Schwarz served in the United States Marine Corps from June 1984 to April 1988. He achieved the rank of corporal, received a number of decorations, and was honorably discharged. Schwarz was recalled to active duty status in February 1991 during the Persian Gulf War, although hostilities ended before he left the country. Schwarz also served in the National Guard from July 1997 to June 1999.

Third, before August of 1997, Schwarz had compiled a notable record as a police officer. He became a police officer in July 1989, first for the Transit Authority and later for the N.Y.P.D. During his service, he received numerous medals and letters of recognition. His performance evaluations were uniformly positive, and he earned departmental recognition for several important arrests.

The Presentence Report indicates that Schwarz was the subject of two prior complaints of abusive conduct as a police officer. The Civilian Complaint Review Board found one of these complaints "unsubstantiated" and deemed Schwarz "exonerated" as to the other. Schwarz is also currently the defendant in a civil lawsuit alleging that he falsely arrested and battered a civilian.

In December 1994, Schwarz was promoted to the Anti–Crime Unit, an elite unit reserved for officers with solid skills and arrest records. In April 1997, Schwarz stepped down from that post and returned to uniformed patrol to make time to care for his brother.

Schwarz's record as a police officer is somewhat blemished by his apparently false testimony at the departmental trial of Anthony Abbate to say nothing of the offenses for which he is being sentenced. Nonetheless, his eight years of service merit consideration.

Viewed collectively, these circumstances warrant a four-point reduction in Schwarz's offense level. *Cf. Rioux,* 97 F.3d at 662–63 (upholding ten-point departure for combination of medical condition and charitable works, even though medical condition remained "stable" and many acts of charity "are not worthy of mention"); *United States v. DeRiggi,* 893 F.Supp. 171, 183–85 (E.D.N.Y.1995) (granting five level-departure where defendant's father confined to wheelchair and required defendant's help, and eight-level departure where second defendant's children relied upon him for childcare and defendant ran family business).

### 3. Aberrant Behavior

Schwarz moves for a departure on the basis of aberrant behavior.

 A defendant's criminal acts may be so aberrant as to justify a downward departure where, in the totality of circumstances, they can be considered "a short-lived departure from an otherwise law-abiding life." *Zecevic v. United States Parole Commission,* 163 F.3d 731, 735 (2d Cir.1998) (internal quotations omitted). But "aberrant behavior and first offense are not synonymous." *Id.* (citation and internal quotations omitted). Rather, the Court considers a range of factors, including

(1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant ... at the time of the offense; (5) the defendant's motivations for committing the crime ...; and (6) his efforts to mitigate the effects of the crime.

*Id.* at 736. This list is not exclusive, and no single factor is dispositive. *Id.*

 It is true that Schwarz's participation in the sexual assault on Louima, by itself, was brief, apparently spontaneous, and without precedent in Schwarz's life. But the conspiracy to obstruct the investigation of that assault was carefully planned and lasted several months. *Cf. United States v. Winters,* 105 F.3d 200, 207 (5th Cir.1997) (defendant's obstruction of justice with respect to "isolated assault" upon a· prisoner "remove[d] his actions from consideration as a single act of aberrant behavior").

As to motivation, the evidence indicates that Schwarz, like Volpe, acted out of a desire to humiliate and debase Louima. *See Volpe II,* 78 F.Supp.2d at 92. That Schwarz believed Louima had hit him—an accusation that other witnesses to the arrest failed to corroborate—does not support a finding that his conduct was aberrant. *See id.* Schwarz makes no claim to having acted under extreme pressure as a result of the events outside Club Rendez–Vous. Moreover, vengeance is not a proper motive for a police officer, particularly when carried out upon an unarmed, handcuffed civilian lying on the floor of a stationhouse bathroom.

Schwarz also has taken no steps to mitigate the effects of his crime. To the contrary, his protracted scheme to frustrate the investigation of the assault only intensified its impact on Louima.

In support of his departure motion, Schwarz has submitted numerous letters attesting to his good character. The Court has considered these letters, but finds that the opinions of Schwarz's family and friends cannot outweigh his criminal conduct and the absence of justification or

mitigation. *Cf. Zecevic,* 163 F.3d at 736 ("[a]part from his status as a first offender and the support of his mother, Zecevic has little else to recommend him for an aberrant behavior departure.").

#### 4. Loss of Career

 Schwarz asserts in passing that a departure is warranted because of "the loss of his career as a result of his conviction." He cites no authority for this argument.

The Supreme Court has flatly rejected loss of a police officer's career as a basis for departure. *See Koon,* 518 U.S. at 109–11, 116 S.Ct. at 2051–52. "Public officials convicted of violating [18 U.S.C.] § 242 have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold. It is to be expected that a government official would be subject to career-related consequences." *Id.,* 518 U.S. at 110–11, 116 S.Ct. at 2052.

#### D. Sentence.

Based on the foregoing, the Court finds that the appropriate offense level is thirty-six, with a range of imprisonment of 188 to 235 months, and imposes a sentence of 188 months.

The Court also imposes a five-year term of supervised release, and as a special condition a prohibition on possession of a firearm. The Court also is required to impose a special assessment of $300, and to order restitution to Louima in the amount of $277,495.00, to be paid at a rate of $25.00 per month. The Court finds that Schwarz will be unable to pay a fine and does not impose one.

### III. Bruder and Wiese

The jury found Bruder and Wiese guilty of conspiracy to obstruct justice in violation of 18 U.S.C. § 371. The maximum term of imprisonment under that section is sixty months, that is, five years.

The Probation Department calculated the total offense level for both Bruder and Wiese to be thirty-two. The minimum term of imprisonment at that offense level would be 121 months, or just over ten years. But the sentence determined by the Guidelines may not exceed the statutory maximum. *See* U.S.S.G. § 5G1.1(a).

The court must sentence Bruder and Wiese to five years imprisonment unless it finds their Guidelines levels to be twenty-five or below, that is, at least seven levels below the Probation Department's calculations.

#### A. Offense Level

The Guideline for conspiracy to obstruct justice is § 2J1.2. *See* U.S.S.G. § 2X1.1(a) (base offense level for conspiracy is derived from base offense level for "substantive offense"); *id.,* Appendix A and § 2J1.2, comment. (§ 2J1.2 is guideline for obstruction of justice). For obstruction of a criminal investigation or prosecution, the Court applies the offense level for the crime as to which the defendants sought to obstruct justice, up to a level thirty. *See* §§ 2J1.2(c)(1) (for obstruction of criminal investigation or prosecution, "apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense"); 2X3.1(a) (offense level is "6 levels lower than the offense level for the underlying offense, but in no event ... more than 30.").

These rules "provide an enhanced offense level when the obstruction [of justice] is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person." *Id.* § 2J1.2(c), comment. (backg'd); *see also United States v. Conley,* 186 F.3d 7, 24 (1st Cir.1999) (offense level for obstruction as to aggravated assault by police officer is determined through guideline for aggravated assault).

The "underlying offense" here is Schwarz's participation in the sexual assault of Louima. The offense level for that offense derived through cross-reference is forty-two, carrying a sentence of thirty years to life imprisonment. This includes a base offense level for criminal sexual

abuse of twenty-seven; four levels for use of force; two levels because Louima was in custody; three levels because of the severity of Louima's injuries; and six levels because Schwarz was a public official acting under color of law. *See* U.S.S.G. §§ 2A3.1(a); 2A3.1(b)(1), 2A3.1(b)(3)(A), 2A3.1(b)(4)(C), and 2H1.1(b)(1).

Although the Guidelines for the "underlying offense" provide for an offense level of forty-two, the Court may apply no more than thirty of those levels to a sentence for conspiracy to obstruct justice. *See id.*, §§ 2X3.1; 2J1.2(c)(1); 2X1.1(a). The range of imprisonment at a level thirty is approximately eight to ten years. *See id.*, Ch. 5, Pt. A.

The Probation Department added a two-level enhancement for victim restraint pursuant to § 3A1.3. *See id.*, §§ 1B1.1(c) (Chapter Three adjustments are applied after calculation of base offense level); 1B1.5 ("[i]f the offense level is determined by reference to another guideline ..., the adjustments in Chapter Three also are determined in respect to the referenced offense guideline").

The Court granted a two-level reduction to Schwarz under § 3B1.2 because he played a comparatively minor role in the sexual assault. That reduction carries over to Wiese and Bruder.

On the other hand, the departure granted to Schwarz on the basis of his relative culpability does not carry over to Bruder and Wiese. Schwarz's departure was based on the extraordinary increase in his offense level caused by Volpe's conduct. There was no similar "spiralling effect" on the offense levels for Bruder and Wiese, because the offense level for the underlying offense was capped at thirty—fourteen points below Schwarz's total offense level before departures. *See* U.S.S.G. § 2X3.1.

The adjusted offense level for the conspiracy to obstruct justice is thus thirty. The minimum term of imprisonment at that level is ninety-seven months, or just over eight years. This is well above twenty-five, the level at which the Court may impose a sentence lower than the statutory maximum of five years.

### B. Defendants' Objections

#### 1. Guideline for Sexual Abuse

Both Bruder and Wiese object to the Presentence Report on several grounds stemming from a single premise: that their offense level should not be based upon the sexual abuse of Louima. Specifically, they argue (1) that criminal sexual abuse is not the proper underlying offense; (2) that their "real" offense was making false statements; (3) that the enhancements related to the sexual assault, such as those for use of force and degree of injury, are not attributable to them; and (4) that they are both entitled to four-level adjustments as "minimal participants" in "the assault of Mr. Louima."

Similarly, Bruder and Wiese seek departures because (1) the punishment for sexual assault "overstates [their] role in the offense"; (2) the offense level does not reflect circumstances that mitigated the effect of the assault on Louima; and (3) their conduct did not "contemplate the harm" punished by the sexual abuse guidelines.

Each of these arguments assumes that Bruder and Wiese are being sentenced for participating in the sexual assault of Louima. That simply is not the case. Bruder and Wiese were convicted of conspiring to obstruct justice as to the sexual assault of Louima. They are being sentenced for the conspiracy alone.

It is true that their offense level is high in relation to other forms of obstructive conduct, such as obstruction as to a non-criminal matter, obstruction as to a lesser criminal offense, or mere false statements. *See* §§ 2J1.2 (base offense level for obstruction of non-criminal investigation or prosecution is twelve); 2F1.2 (base offense level for false statements is six).

But this is neither an error nor an unforseen consequence of "a shuffling of

guidelines," as defendants suggest. Rather, the offense level is high because, under the Guidelines, a conspiracy to obstruct justice is punished in proportion to the seriousness of the offense as to which a defendant endeavored to obstruct justice, subject to certain limitations. *See* § 2J1.2(c), comment. (backg'd) (cross-reference to underlying offense provides for "enhanced offense level when the obstruction is in respect to a particularly serious offense").

The Guidelines accomplish this end through a series of cross-references, one of which is called "Accessory After the Fact." *See* U.S.S.G. § 2X3.1. That title is inaccurate in this context: Bruder and Wiese are not being punished as accessories to sexual abuse, but as members of a conspiracy to obstruct justice with respect to sexual abuse. *See United States v. Gay*, 44 F.3d 93, 95 (2d Cir.1994). Their lack of culpability with respect to the assault itself is thus irrelevant.

Moreover, the applicable law ensures that the sentence for conspiracy to obstruct justice is appropriately lower than the sentence for the underlying offense. Section 2X3.1 limits the offense level for the "underlying offense" to "no more than thirty." This decreases the potential term of imprisonment from a minimum of thirty years to a maximum of ten years. The pertinent conspiracy statute cuts the maximum prison term in half again to five years. *See* 18 U.S.C. § 371.

Defendants also assert that their offense levels overstate their culpability in harming Abner Louima. Louima was the primary victim of the sexual assault, but he was not the sole victim of the ensuing conspiracy. In addition to magnifying the effect of the crime on its target, a conspiracy to obstruct justice harms, most importantly, the rule of law. This harm is especially acute when police officers conspire to thwart an investigation into such a violent abuse of official authority.

## 2. Guideline for False Statements

Bruder and Wiese urge the Court to apply the Guideline for making false statements, which they assert is the "real offense" at issue, rather than that for sexual abuse. They cite § 1B1.2(a), which instructs the sentencing court to "determine the offense guideline section ... most applicable to the offense of conviction (*i.e.,* the offense conduct charged in the count of the indictment ... of which the defendant was convicted)."

The Guideline proposed by Bruder and Wiese as "most appropriate" is § 2F1.1, which governs fraud and deceit, including the making of false statements as defined by 18 U.S.C. § 1001.

Defendants rely primarily on a Third Circuit decision, *United States v. Smith*, 186 F.3d 290 (3d Cir.1999). The defendants in *Smith* were convicted of both conspiracy to commit fraud and money laundering. Finding that the money laundering guideline was meant to punish conduct linked to "extensive drug trafficking and serious crime," the court held that the sentencing judge had erred in applying the money laundering guideline rather than the more lenient fraud guideline. *Smith*, 186 F.3d at 300.

Defendants also rely on *United States v. Elefant*, 999 F.2d 674 (2d Cir.1993) for the proposition that the Court may apply a guideline other than that applicable to the offense of conviction.

Neither *Smith* nor *Elefant* is applicable here. Unlike the defendants in *Smith*, Bruder and Wiese were not charged with or convicted of violating any statute to which the fraud guideline applies. That guideline thus is clearly not the one "most applicable to the offense of conviction." *See* U.S.S.G. § 1B1.3 and Appendix A.

Moreover, unlike the conduct in either *Smith* or *Elefant*, the conduct of Bruder and Wiese falls squarely within the heartland of the contested guidelines. These defendants were charged with and convicted of conspiracy to obstruct justice as to

the sexual assault of Louima. The "most applicable" guidelines are those for conspiracy, obstruction, and, within the limits discussed above, sexual abuse.

### 3. Role in the Offense

Bruder and Wiese both seek four-level downward adjustments under § 3B1.2 as "minimal participants" in the sexual assault on Louima. But, as discussed, they are not being sentenced for taking part in that assault. Their role in the assault, as distinct from the conspiracy, is irrelevant to their offense level.

Bruder and Wiese each also raises several alternative arguments with respect to their roles in the offense.

#### a. Bruder

Bruder seeks an adjustment under § 3B1.2 because he "actually helped Louima" on the morning of the assault by removing Louima's handcuffs, requesting medical assistance, giving him water to drink, retrieving his shoe, and finding him a chair. He seeks a downward departure on the same basis.

These acts might be pertinent were Bruder being sentenced for the assault on Louima rather than a conspiracy to obstruct justice. But Bruder's conduct toward Louima scarcely mitigated his role in the conspiracy. Indeed, that conspiracy largely negated any "help" Bruder may have given Louima immediately after the assault.

Bruder also moves for a departure on the basis of three other "mitigating circumstances not taken into account" in the applicable Guidelines.

First, Bruder asserts that he became involved in this case "only through the sheer bad luck" of being partnered with Volpe on August 9, 1997. Bruder is not a victim in this case. The conspiracy of which Bruder was convicted lasted for several months past August 9. Bruder's role in that conspiracy consisted of a sustained series of deliberate acts, not a single unlucky accident.

Second, Bruder argues that his crime took place "after the sexual abuse had occurred," and that he could not "undo[ ] Volpe's victimization of Louima." But Volpe's victimization of Louima is irrelevant. What is relevant is the further harm to Louima, and to the rule of law, inflicted by the conspiracy to cover up certain aspects of the assault.

Third, Bruder says that, even assuming he had disclosed "that Schwarz accompanied Louima to the bathroom, the probative effect of that disclosure is doubtful," because that fact, if revealed, would be insufficient to prove that Schwarz "participated in Louima's beating."

This is a bizarre argument, if only because statements by other officers that Schwarz led Louima *toward* the bathroom were important to the investigation and prosecution of the assault. If indeed Bruder had seen and disclosed that Schwarz led Louima *to* the bathroom, that statement would hardly have been "immaterial."

Bruder's argument also assumes that his "nondisclosure" of Schwarz's whereabouts was his only dereliction. But Bruder also told investigators, among other things, that Louima's pants were up when he was led to the bathroom, and that he, Bruder, found an advertisement or business card for an "all-male sex club" or "all-male revue." None of these statements was corroborated by credible evidence, and each was or may have been "material" to the investigation.

Most importantly, Bruder is guilty of conspiring to obstruct justice, not merely of making specific false statements. He is thus culpable for the full scope of the conspiracy.

#### b. Wiese

Wiese argues that he deserves a mitigating role adjustment because he was the "first [to] provide[ ] the investigators with a 'window' into what occurred both outside

and inside the bathroom[,] and [to disclose] that it was Volpe who was the perpetrator."

The "window" Wiese professes to have provided consisted of false and misleading statements—statements charged as overt acts in the conspiracy. In addition, Wiese was *not* the "first" to identify Volpe as the perpetrator. Louima did so on August 11, 1997. Turetzky and Schofield had also provided key information inculpating Volpe before Wiese came forward. In fact, Volpe was arrested on August 13, 1997, four days before Wiese gave his statement to Inspector Burns.

Wiese's only "contribution" was thus to lie about Schwarz's whereabouts. He scarcely deserves a lesser sentence for committing acts that comprised a significant part of his crime.

Wiese makes two additional arguments with respect to his culpability also made by Bruder: that his crime occurred after the sexual assault and thus that he could not "undo" the injury to Louima; and that his "nondisclosure" of Schwarz's whereabouts was immaterial. These arguments are addressed above.

#### 4. Double Counting

Bruder and Wiese object to what they characterize as "double counting" in the offense level for the sexual assault. Their argument restates objections raised by Schwarz, which are addressed above.

### B. Grounds for Departure

As noted, the Court must sentence Bruder and Wiese to sixty months unless their total offense level is twenty-five or below. *See* U.S.S.G. § 5G1.1(a). Reaching that level would require a departure of at least five levels. Both Bruder and Wiese qualify for departures of several points, but neither merit departures sufficient to bring their sentence below the statutory maximum.

#### 1. Susceptibility to Abuse

The Court granted a two-level downward departure to both Volpe and Schwarz because their status as police officers and the notoriety surrounding the case left them unusually vulnerable to abuse in prison. *See Volpe II*, 78 F.Supp.2d at 87–89; *see also Koon*, 518 U.S. at 112, 116 S.Ct. at 2053. Bruder and Wiese are entitled to similar consideration, but for several reasons are entitled to a lesser departure.

First, these defendants were not convicted of taking part in the sexual assault itself. While the stain of that act indelibly marks every defendant in the case, it presumably is more pronounced for the two men who committed it than for Bruder and Wiese.

Similarly, the publicity surrounding Bruder and Wiese, while extensive, has been lower both in intensity and amount than the media attention to Volpe and Schwarz. *Cf. United States v. Colbert*, 172 F.3d 594, 597–98 (8th Cir.1999) (denying downward departure for police officer in absence of "extraordinary publicity").

Finally, Bruder and Wiese will spend less time in prison than Volpe and Schwarz. Even if the conditions of their incarceration are unusually harsh, their exposure to such conditions will be less protracted. The proportionality concerns behind the departures for Volpe and Schwarz, *see Volpe*, 78 F.Supp.2d at 88, are thus less pronounced for these defendants. *See United States v. Elefant*, 999 F.2d 674, 678 (2d Cir.1993) ("[t]he degree of downward departure appropriate from one starting point will not necessarily be the same as is appropriate from a lower starting point.").

The court finds that a one-level departure is warranted on this ground.

#### 2. Employment and Family Circumstances

As noted, a defendant's family responsibilities, employment record and charitable acts or other "good works" are "not ordinarily relevant" in determining whether a departure is warranted. *See* U.S.S.G. §§ 5H1.5, 5H1.6, 5H1.11. But these factors, either alone or in combination, may

warrant a departure when present to such an "exceptional degree" as to "differ significantly from the 'heartland' cases covered by the guidelines." *Koon*, 518 U.S. at 96, 116 S.Ct. at 2045; U.S.S.G. § 5K2.0.

### a. Bruder

 During Bruder's six years as a police officer, he received generally positive evaluations and several citations and commendations, including a "Cop of the Month" award. He was one of only two officers from his precinct to be recommended and appointed to the police department's elite Burglary, Assault, Shootings and Homicide unit. He also incurred six line-of-duty injuries during his service.

As to family responsibilities, Bruder's mother suffers from breast cancer, a heart condition, back pain, and hypertension. Bruder currently lives with and helps greatly in caring for his mother. The Presentence Report states that Bruder's mother was "brokenhearted" and "devastat[ed]" by the verdict, and that Bruder was her "salvation and reason for living."

Taken together, these characteristics justify a two-point departure.

### b. Wiese

 Wiese's ten-year service as a police officer was clearly exceptional. He received consistently outstanding evaluations, including one in which he was characterized as an "extremely competent" officer whose performance was "exceptional and rarely equalled." He received various commendations and acknowledgments for important arrests, and in 1996 was named a member of the Honor Legion after risking his life to arrest a dangerous felon.

Wiese also incurred seventeen line-of-duty injuries during his service.

Wiese has a modest record of charitable works, including forming and teaching a meditation and martial arts class for his brother and other terminally ill patients.

Taken together, these factors justify a two-point departure.

### 3. Combination of Circumstances.

Bruder and Wiese argue that the combination of the various grounds for departure they urge warrants a departure, even if the individual bases do not. The Court has considered the combination of circumstances, and finds that no further departure is justified.

### D. Sentences.

The final offense level for both Bruder and Wiese, including cross references and departures, is thus twenty-seven. The minimum term of imprisonment at that level is seventy months. Under these circumstances, the Court must sentence these two defendants to the sixty-month statutory maximum. *See* 18 U.S.C. § 371; U.S.S.G. § 5G1.1(a).

The Court is also required to impose a term of supervised release of at least two but not more than three years. *See* 18 U.S.C. §§ 3583(a) and (b)(2); U.S.S.G. § 5D1.2(a)(2). The term of supervised release for Bruder and Wiese shall be three years, and as a special condition a prohibition on possession of a firearm.

The Court imposes a mandatory special assessment of $100 on each defendant. The Court does not impose fines, finding that neither defendant is able to pay a fine.

So ordered.

# APPENDIX I

## CHARLES SCHWARZ

**Count One:**
- 188 months imprisonment;
- restitution in the amount of $277,495.09, to be paid at the rate of $25.00 per month until the entire sum is paid.
- 5 years Supervised Release, with a special condition of prohibition on possession of a firearm.

**Count Four:**
- 188 months imprisonment, concurrent with Count One.

**Count Twelve:**
- 60 months imprisonment (statutory maximum), concurrent with Counts One and Four.

**Special Assessment:** $300

## THOMAS BRUDER

**Count Twelve**
- 60 months imprisonment (statutory maximum);
- 3 years Supervised Release, with a special condition of prohibition on possession of a firearm.
- Special assessment: $100.

## THOMAS WIESE

**Count Twelve**
- 60 months imprisonment (statutory maximum);
- 3 years Supervised Release, with special condition of prohibition on possession of a firearm.
- Special assessment: $100.

APPENDIX II

# 1st Floor of **70th PRECINCT**
## Lawrence Avenue,
## Brooklyn, New York