*373 OPINION OF THE COURT
Eileen Bransten, J.
In this CPLR article 78 proceeding, petitioners former police officers Thomas Bruder and Thomas Wiese seek a judgment annulling the July 6, 2006 determination of respondent Raymond W Kelly, as Police Commissioner of the City of New York, which denied their applications for reinstatement to the New York City Police Department (NYPD) pursuant to Public Officers Law § 30 (1) (e), and reinstating them to the NYPD with full back pay, benefits, and seniority restored as of March 6, 2000. (See, notice of petition.) Respondents — the Commissioner, the NYPD and the City of New York — oppose the petition.
Background
On Saturday August 9, 1997, former NYPD officers Charles Schwarz, Justin Volpe, Thomas Bruder and Thomas Wiese were involved with the arrest of Abner Louima. Mr. Louima was physically assaulted by officers in a police vehicle while on the way to the police station and was then physically and sexually assaulted by Mr. Volpe and a second police officer while inside the 70th precinct’s bathroom. (Verified answer ¶ 49; see also, United States v Bruder, 103 F Supp 2d 155, 159-165 [ED NY 2000].)
The next day, NYPD’s Internal Affairs Bureau opened an investigation into the assaults. (Answer ¶ 50.)
Three days after the assaults, on August 12, 1997, New York 1 News reported Mr. Louima’s allegations of sexual assault. (Answer ¶ 52.) Within hours of the news breaking, 20 calls were made between phones used by Mr. Wiese, Mr. Schwarz, Mr. Bruder and Anthony Abate, a former police officer and close friend to Mr. Schwarz. (Id.) After the New York Daily News carried a story about the incident the following day, there were six phone calls between the officers. (Id. 1i 53.)
On August 13th, the FBI opened an investigation into the incident. (Id. ¶ 55.)
Mr. Volpe was arrested that same day. (Answer If 56.) After the arrest, phone records indicate at least eight calls exchanged between Mr. Wiese, Mr. Schwarz, Mr. Bruder and Mr. Abate. Sixteen calls were made on August 14, 1997. (Answer ¶ 56.)
“All told, there were fifty-seven calls between phones used by [Mr. Bruder, Mr. Wiese and Mr. Schwarz] from August 11 to August 14, 1997, and another twelve between [Mr.] Abate’s *374 home phone and phones used by [Mr. Schwarz and Mr. Wiese].” (United States v Bruder, 103 F Supp 2d at 170.)
On the morning of August 15, 1997, Police Officer Eric Turetsky, who was present at the 70th precinct on the night of the assault, spoke with internal affairs investigators and informed them that he witnessed Mr. Schwarz lead Mr. Louima in the direction of the bathroom. (Answer ¶ 57.)
That same day, Mr. Schwarz was arrested. (United States v Bruder, 103 F Supp 2d at 170.)
Also on August 15, 1997, before Mr. Schwarz’s arrest, Mr. Wiese spoke with Michael Immitt, a patrol officer and trustee of the Patrolmen’s Benevolent Association for the region including the 70th precinct. (United States v Bruder, 103 F Supp 2d at 170.) According to Officer Immitt, Mr. Wiese’s story was that after searching Mr. Louima at the front desk, Mr. Schwarz “ ‘started to walk him away from the desk,’ ” and then Mr. Volpe “ ‘took control’ ” of Mr. Louima in the front hallway near the desk. (Id.) Then, according to Officer Immitt, Mr. Wiese told him that Mr. Volpe, acting alone, took Mr. Louima to the back of the precinct while Mr. Wiese and Mr. Schwarz remained near the front desk. Mr. Wiese stated to Officer Immitt that Mr. Schwarz remained at the front desk until they left together for the hospital. (Id.)
The following day, on August 16, 1997, Mr. Bruder reported to internal affairs officers that he saw Mr. Volpe take Mr. Louima from the desk area and head directly to the bathroom. (Answer U 59.) Mr. Bruder did not mention that either Mr. Schwarz or Mr. Wiese accompanied Mr. Louima and asserted that he disclosed “everything he knew.” (Answer ¶ 59, quoting United States v Bruder, 103 F Supp 2d at 171.) Mr. Bruder’s August 16th statements were consistent with what Mr. Wiese reported to Officer Immitt. (United States v Bruder, 103 F Supp 2d at 171.)
Subsequently, newspapers reported that an unidentified officer told investigators that Mr. Schwarz had taken Mr. Louima toward the bathroom. (Answer ¶ 60.)
On August 17, 1997, Mr. Wiese met with investigators and shared a different account from that delivered to Officer Immitt. This time he recounted that he and Mr. Volpe together led Mr. Louima away from the desk and that while Mr. Volpe went into the bathroom with Mr. Louima, he stayed outside the door petting the station house dog. Mr. Wiese gave a detailed account *375 of the incident and claimed that during this time, Mr. Schwarz was at the main desk. (Answer ¶ 62-63.)
On August 18, 1997, Mr. Bruder made a statement corroborating Mr. Wiese’s latest version of the events. (Answer ¶ 64.) Mr. Bruder stated that he saw “Volpe and Wiese escorting Louima toward the bathroom,” and observed “Volpe go into the bathroom with Louima while Wiese waited outside near the bathroom door playing with a stray dog.” (Answer ¶ 64, quoting United States v Bruder, 103 F Supp 2d at 173.) It was this statement, which Mr. Bruder repeated to federal investigators on November 8, 1997, that formed the basis of his and Mr. Wiese’s indictment for obstruction of justice since it was at odds with Mr. Volpe and Mr. Louima’s testimony and inconsistent with statements that they themselves had given days earlier. (Answer ¶¶ 64-66.)
In March 1998, a federal grand jury returned a superseding indictment charging petitioners, among others, with the assault in the car and with conspiracy to obstruct justice based on provision of “ ‘false and misleading information to federal and local law enforcement authorities in an effort to exculpate the defendant Charles Schwarz with respect to the sexual assault of Abner Louima.’ ” (Answer ¶ 67, quoting answer, exhibit 4 [superseding indictment].)
On June 8, 1999, petitioners were found not guilty of the assault in the car. (Answer ¶ 70.)
On March 6, 2000, after a separate second trial that dealt with the conspiracy to obstruct the grand jury charges, petitioners, along with Mr. Schwarz, were convicted by a jury of conspiracy to obstruct the federal grand jury investigation into the sexual assault of Mr. Louima. (Answer ¶ 71.)
Upon their convictions, Mr. Bruder and Mr. Wiese were automatically removed from their positions with the NYPD. (Verified petition 1Í 7; answer If 72; Public Officers Law § 30 [1] [e].)
Petitioners and Mr. Schwarz appealed to the United States Court of Appeals for the Second Circuit, which reversed their convictions. The Second Circuit explained that the evidence at trial was plainly sufficient for a jury to find that:
“soon after the state investigation into Louima’s assault began, Schwarz, Bruder and Wiese agreed generally to impede investigators by putting forth and corroborating a false version of what occurred. Amid *376 numerous communications among the appellants and others at key points during the investigations, appellants offered parallel accounts that evolved as other evidence in the case surfaced. For instance, all three appellants initially made statements to the [internal affairs] investigators and others to the effect that Volpe alone escorted Louima to the bathroom, while Wiese and Schwarz remained at the front desk. After news accounts revealed a few days later that the authorities had an account that Schwarz escorted Louima to the bathroom, Bruder and Wiese both changed their earlier stories to assert to state and federal investigators that Wiese, not Schwarz, accompanied Volpe in escorting Louima, while Schwarz stayed at the front desk. . . .
“There is little need to recite in further detail all of the evidence that would have supported a jury finding that the appellants agreed to mislead both state and federal investigators. If this had been the object of the conspiracy charged, we have no doubt that such a jury verdict would be upheld.” (United States v Schwarz, 283 F3d 76, 106 [2d Cir 2002]; answer, exhibit 6.)
Ultimately, because Mr. Bruder had never been called to testify before the grand jury and there was no evidence that he was given any indication that his statements would be repeated to the grand jury, the Second Circuit held that there was no evidence demonstrating that Mr. Bruder intentionally obstructed the grand jury. The court emphasized that precedent established that if there is no knowledge that actions were likely to affect the judicial proceeding the “requisite intent to obstruct” could not be demonstrated. (Id at 109.) In addition, because Mr. Bruder was the only alleged conspirator to have engaged in conduct directed toward the federal investigators, the entire conspiracy theory failed and all of the convictions on that ground were reversed.
No longer convicted of any crimes, in November 2002, petitioners applied for reinstatement to the NYPD and requested back pay from March 6, 2000 (the date of their conviction and automatic dismissal). (Verified petition U 21.) They sought automatic reinstatement, or, alternatively, a reinstatement hearing pursuant to Public Officers Law § 30 (1) (e). (Verified petition ¶ 21.)
*377 In March 2004, petitioners commenced an article 78 proceeding requesting reinstatement. After the NYPD agreed to conduct a reinstatement hearing, however, they agreed to withdraw their petition.
At an August 2004 prehearing conference counsel for petitioners stated that “petitioners’ expectations are that this matter will be submissions” and that they did not anticipate calling any witnesses. (Verified petition, exhibit D.)
On December 14, 2004, Assistant Deputy Commissioner for Trials (ADC) Michael Sarner heard oral argument of the reinstatement application and the parties submitted their papers. Petitioners argued, among other things, that they should be reinstated based on their exceptional records of achievement while serving on the NYPD and that they should not be denied reinstatement based on “dicta in the Court of Appeals’ decision that hypothetical convictions against petitioners could possibly have survived an appeal had the United States Attorney’s Office charged petitioners with a different crime.” (Verified petition ¶ 26.) Petitioners explained that they never had an opportunity to defend themselves against those charges because they were never at issue. (Id.)
ADC Sarner issued an 11-page report and recommendation on March 21, 2005. ADC Sarner referenced receiving 82 letters from petitioners’ families, friends, neighbors, community members and NYPD officers all attesting to their good character and reputations. (Verified petition, exhibit I.) Nonetheless, denial of their reinstatement applications was recommended because, as the Second Circuit Court of Appeals stated, there was “ample evidence that [they] had tried to ‘impede the investigations’ of . . . authorities.” (Id. at 6.) ADC Sarner explained that reversal of the convictions was not dispositive, particularly since the reversing tribunal found that there was evidence demonstrating an agreement to impede investigators, including telephone calls, meetings and other contacts “all of which were connotative of a conspiracy to conceal what happened at the 70[th] Precinct station house on the night of August 9, 1997.” (Verified petition, exhibit I, at 7.)
The report made clear that in reversing the convictions, the “Court essentially asserted that the prosecutors, to the detriment of their case, merely established that Petitioner Bruder made false statements to federal investigators, but they failed to show that he intended his statements to reach and mislead the *378 grand jury.” (Verified petition, exhibit I, at 9.) ADC Sarner explained that based
“on the foregoing, the Petitioners, while technically exonerated, are hardly vindicated and remain tainted for the purpose of regaining their positions as police officers, which require more than they be conviction free — they must be imbued with the public’s trust, which is doubtful given the lingering concerns about their credibility expressed by the Court.” (Id. at 10.)
ADC Sarner concluded the report emphasizing “[tjhat the Petitioners’ otherwise fine records cannot overcome this evidence only compounds this tragedy.” (Id. at 11.)
On March 30, 2005, petitioners submitted a letter to the Commissioner requesting rejection of ADC Sarner’s report. (Verified petition, exhibit J.) They maintained that “ADC Sarner did not stress the officers’ outstanding employment records with the NYPD. Rather, ADC Sarner found that the very Court of Appeals decision that reversed the criminal conviction warranted denial of their reinstatement application.” (Verified petition, exhibit J, at 2.) They emphasized that administrative determinations should not be based on conjecture and that they had never been charged with the misconduct for which ADC Sarner refused to reinstate them; consequently, “to prohibit reinstatement . . . based on alleged misconduct that they did not defend against at the federal trial flies in the face of administrative law.” (Id.; see also, id. at 3.)
The NYPD responded that Public Officers Law § 30 (1) (e) “not only gives the hearing officer wide latitude in the evidence he considers in granting or denying Petitioners’ application, but specifically mandates that he consider the final judgment of the court that overturned the conviction.” (Verified petition, exhibit K.)
On July 6, 2006, the Commissioner determined:
“Having reviewed the record in this matter, I find that the petitioners have not met their burden for demonstrating their entitlement to reinstatement to the position of Police Officer in the New York City Police Department. Accordingly, I adopt the recommendation of Assistant Deputy Commissioner, Trials, Michael D. Sarner and deny the petitioners’ application for reinstatement.” (Verified petition, exhibit M.)
*379 Petitioners now challenge the Commissioner’s determination pursuant to CPLR article 78. They assert that denial of their reinstatement applications “was arbitrary and capricious because it was based on conjecture as to what a hypothetical jury would have done had it credited the Government’s evidence at a different trial on a different charge than that to which petitioners defended themselves against at the Federal Court trial.” (Verified petition ¶ 43.) Petitioners further seek back pay upon reinstatement pursuant to Public Officers Law § 30 (1) (e). (Verified petition ¶ 45.)
Respondents counter that they “demonstrated a good-faith basis to deny Petitioners’ applications for reinstatement as Petitioners made numerous false and misleading statements during the investigation into the assaults of Abner Louima with the intent to frustrate the investigation into said assaults and to cover-up the involvement of Charles Schwarz in said assaults.” (Answer at ¶ 95.)
Because the Commissioner’s determination is not irrational, arbitrary or capricious, it must be upheld.
Analysis
It is well settled that the standard for judicial review of an administrative determination pursuant to CPLR article 78 is limited to inquiry into whether the agency acted arbitrarily or capriciously — without any sound basis in reason. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231-232 [1974]; see also, Matter of Arrocha v Board of Educ. of City of N.Y., 93 NY2d 361, 363 [1999].) Provided there is some — indeed, any — rational basis or credible evidence to support an administrative determination, the agency’s decision must be upheld. (See, Matter of Pell v Board of Educ., 34 NY2d at 231; Matter of 370 Manhattan Ave. Co., L.L.C. v New York State Div. of Hous. & Community Renewal, 11 AD3d 370 [1st Dept 2004] [determination was not arbitrary and capricious since there was a “rational basis” in the record supporting it].)
Public Officers Law § 30 (1) (e), moreover, provides that an officer removed from the job solely because of a conviction “may apply for reinstatement . . . upon [its] reversal.” The officer is entitled to a reinstatement hearing, the record of which “shall include the final judgment of the court which reversed . . . such conviction and may also include the entire employment history *380 of the applicant and any other submissions which may form the basis of the grant or denial of reinstatement notwithstanding the reversal ... of such conviction.” (Public Officers Law § 30 [1] [e].) The statute further provides that “after review of such record, the appointing authority may, in its discretion, reappoint such . . . official.” (Id. [emphasis added].)
Denial of reinstatement under these circumstances was a proper exercise of discretion. It was neither arbitrary nor capricious. The Commissioner refused to reinstate petitioners based on the thorough report by ADC Sarner, in which petitioners’ “otherwise fine records” and 82 letters attesting to their good character were considered. Reinstatement was denied after consideration of the “final judgment” of the reversing court and all of the parties’ submissions, based on evidence that petitioners impeded law enforcement authorities’ investigation of one of the most notorious cases of police brutality in New York history.
Petitioners were not reinstated because they themselves relayed inconsistent accounts of the events of August 9, 1997 and “remain tainted.” (Verified petition, exhibit I, at 10.) It does not matter that they are conviction free “given the lingering doubts about their credibility.” (Id.) Regardless of whether they ultimately would have been convicted of other crimes, there was a rational basis for the Commissioner, as a matter of discretion, refusing to return them to NYPD service in view of the importance of the public trust in police officers. (Cf., Matter of Panek v Bennett, 38 AD3d 1251, 1252 [4th Dept 2007] [“The determination that any penalty short of termination would discredit the integrity of the State Police and damage the trust and confidence of the public ... is entitled to great deference”]; see also, Matter of Di Rienz v Constantine, 151 AD2d 953, 955 [3d Dept 1989] [emphasizing that position as police officer involves “great sensitivity and public trust necessitating ... a high standard of character and fitness” that is inconsistent with actions involving dishonesty and a lack of integrity]; Matter of Buttacavoli v Guido, 59 AD 2d 891, 891 [2d Dept 1977], lv denied 44 NY2d 643 [1978] [acknowledging the “overriding public interest of maintaining an efficient and honest police force deserving of the public’s trust and confidence”].)
In the end, petitioners had a full and fair opportunity to be heard with respect to their reinstatement application. It was *381 not arbitrary, capricious, an abuse of discretion or irrational for the Commissioner to determine that doubts about their credibility outweighed their otherwise good records in denying reinstatement.
Accordingly, it is ordered and adjudged that the petition is denied and the proceeding is dismissed.